[57] JOSEPH F. SMITH vs. JAMES POWER — Appeal from Travis County.

Upon an application for a *mandamus* it is the duty of the plaintiff to summon, by proper process, all the parties who are interested, if known, to come in and defend their interests.    [5 Tex. 484; 10 Tex. 375; 29 Tex. 509.]

If persons interested in the subject matter in controversy have not been summoned by the plaintiff, still, if they have a knowledge of the proceeding, it is their duty to come in and defend their interests; failing to do this they have no right to bring a separate action to litigate the same matter in another suit.   Such separate action is but a multiplication of suits and of the vexation of litigation.   [6 Tex. 185.]

When a separate action is improper no injunction to restrain the proceedings in the original suit for causes alleged in that separate action should be granted, and when granted should be dissolved on motion.

When the time limited by an injunction for restraining proceedings has expired previous to the hearing of the cause in the appellate court, that court may order the injunction to be dissolved although the time had not expired when the motion to dissolve was heard and decided in the lower court, and the expiration of the time was not made a ground in the lower court for dissolution.

" Where the answer denies all the circumstances upon which the equity is founded, the injunction will be dissolved as a matter of course; otherwise it will be continued to the hearing."   In this case, " the allegations of the answers do not severally, or taken altogether, present any clear ground for the dissolution of the injunction before the hearing."

The plaintiff in error, Joseph F. Smith, for himself, and as agent for others, instituted suits in the district court of Travis county, praying for a peremptory *mandamus* against the commissioner of the general land office, to compel him to issue

patents for certain lands which had previously been located and surveyed in the county of Refugio for him, Smith, and for those whom he represented.

Sometime after the institution of these suits and while they were pending, the defendant in error, James Power, filed his bill in the same court, alleging that the lands located by Smith and others, and for which they were seeking by their *mandamus* suits to obtain patents, were his property, lawfully [58] obtained from the government of Coahuila and Texas, anterior to the revolution and separation of Texas from Mexico. He alleged that his titles to the lands were all obtained in good faith and for sufficient consideration; that the lands were regularly located and surveyed by the proper officers of the country at the time and in strict conformity with all the laws then in force; that his titles were duly and legally executed by the proper officer of the government, and that they were on file in the general land office of Texas; and that Smith, when he made or caused the location and surveys to be made for himself and others on said lands, well knew that they were not public lands, subject to location, but that they were his, Power's, lands. It is also alleged in the bill, that in consequence of the confusion produced in the land office in the county of Refugio by the wars of the revolution, the destruction of its maps and papers, and the impossibility of restoring things to their proper state by the subsequent almost entire depopulation of the country, from the frequent inroads and and encroachments of the enemy, thus preventing the transaction of business and particularly the resurveying and platting of large bodies of wild lands in a country wholly unprotected and peculiarly exposed to the depredations of the enemy, the lands of Power are not delineated on the map of Refugio county; and it admits that in consequence of many of his, Power's, principal calls being for the lands of others, the position of which were well known at the time his surveys were made, but the plats and titles of some of which have since been taken from the country or were lost or destroyed in the general confusion produced by the war of the revolution, that the commissioner of the general land office cannot

now correctly delineate his lands upon the county map, until they are resurveyed. The bill further alleges that he, Power, after great efforts had succeeded in obtaining the passage of a law requiring all the lands held under old Mexican titles in the county of Refugio to be resurveyed at the expense of the owners thereof, and [59] the plats of the same to be correctly delineated on the general map of the county, as a guide to direct the commissioner of the general land office in the issue of patents; but from the length of time allowed for these resurveys to be made, he is apprehensive that patents will be issued upon locations made upon his lands, before the surveys are returned, unless the commissioner is restrained from issuing such patents. The bill then prays for an injunction to restrain the commissioner from issuing patents to the said Joseph F. Smith and others, for any of the lands which it describes, where surveys are known or appear to have been on said lands, but which cannot be positively determined in consequence of the defects in the map of the county in not representing the lands thereon, until the same have been resurveyed and the plats thereof represented on the county map. It further prays for an order of survey to resurvey said lands, and that Joseph F. Smith and others be made parties, and enjoined from prosecuting their suits against the commissioner of the general land office until it can be ascertained whether the lands claimed by said Smith are not the lands of the complainant.

An injunction was ordered and issued in accordance with the prayer of the bill. Smith subsequently filed his answer and amended answer, and moved to dissolve the injunction. He alleged that the plaintiff's bill was too vague and general to support an action; that his claims by purchase have no foundation in law or reason; that his titles were issued by a person who had no authority in law, or if he had, he transcended his authority; that the titles so issued have no identity as to location, and do not conflict with the defendant's claims; or if they do, were made upon surveys that contain from five to ten times the quantity of land called for in the grants, contrary to the laws then in force. He sets out his own locations

and surveys, and says he does not think they conflict with the complainant's according to the plaintiff's calls, boundaries, courses and distances. He alleges that the boundaries [60] of one of the plaintiff's titles for eleven leagues would embrace one hundred and ten leagues, which is a fraud apparent on its face, and would avoid the grant, and that the title was obtained by false suggestions and fraudulent representations; that the plaintiff's title for a headright is void, and that subornation of perjury was committed in obtaining it; that the plaintiff was not an empresario; that he had no contract to colonize, and that his pretensions to a colony were settled by his acceptance of sixteen leagues of land in full for his nominal claims to a colony.

There are other parties and matters embraced in the bill, and other allegations in the answer, some of which are adverted to in the opinion of the court, but as the foregoing contains the material facts involved in the question presented to and decided by the court, it is deemed unnecessary to give a further detail of them.

The district court refused to dissolve the injunction, from which interlocutory order, the present writ of error was sued out.

*Paschal* and *Paschal*, for plaintiff in error.

*Webb* and *Howard*, for defendant in error.

Mr. Chief Justice HEMPHILL delivered the opinion of the court.

The plaintiff in error being one of several defendants in an action instituted by James Power, defendant in this court, and plaintiff below, had, on filing his answer, moved to dissolve an injunction which had been granted; and on the overruling of this motion, this writ of error was sued out.

The said plaintiff, James Power, had filed his petition, stating that in part consideration for services rendered by himself and his partner, James Hewitson, to the then existing government of Coahuila and Texas, in colonizing and settling a certain tract of country then belonging to the said [61] state,

but now lying within the limits of the republic of Texas, and known as Power and Hewitson's colony, there were granted him, by the proper authorities of the said state of Coahuila and Texas, several leagues of premium lands, the locations of which are described, and are stated as lying and situate, or the greater part of them, within the now county of Refugio. He further represents, that on the 24th December, 1829, there was granted to him and his said partner, James Hewitson — but in their individual rights as Mexican citizens, by the proper authorities of the said state of Coahuila and Texas — two separate grants, or concessions of eleven leagues of land each, the locations and boundaries of which are described, and they are stated as lying and being situate within the county of Refugio.

He further represents that there was granted to one Francisco del Prado, a Mexican citizen, by the government of Coahuila and Texas, on the 22d of January, 1831, a concession of eleven leagues, in conformity with the law of colonization, of the 24th March, 1825, and that anterior to the 26th November, 1834, he purchased a concession of eleven leagues of land from one Francisco de la Pena, a citizen of Mexico, which concession was made to the said Francisco de la Pena, in conformity with the law of colonization. The locations of the lands embraced in these concessions are defined; and they are described as lying and being within the county of Refugio.

He also claims some additional lands as granted to him and his partner, for their respective headrights, and which are described as having been surveyed within the county of Refugio. The petitioner alleges, that one Henry Smith and Joseph F. Smith, a near relative of the said Henry, and others, well knowing that all the above claimed lands were his property, procured from various individuals, certain land claims, known as headright certificates, land scrip and military bounty certificates, and fraudulently caused said land •claims to be located and surveyed upon the lands aforesaid [62] of the petitioner, well knowing that, at the time the said locations and surveys were made, the said lands were not vacant, and that they did

not belong to the public domain of Texas, and were, in truth and in fact, the lands of your petitioner, legally owned, held and possessed by him and not subject to location.

The petition, after making various allegations in relation to the conduct of Henry Smith, states that Joseph F. Smith, the plaintiff in error, had filed a petition, praying for a peremptory *mandamus* against the commissioner of the general land office, requiring him to issue patents to the said Joseph F. Smith, for himself and divers other persons, upon locations and surveys made upon the lands of your petitioner, although the said Smith well knew that the said locations and surveys were made upon the lands of your petitioner. And the said Smith and others are represented as urging the commissioner of the general land office to issue patents upon their surveys, alleging that the plats and surveys of the petitioner's lands, not appearing upon the map of the county of Refugio, the said commissioner is not bound to respect the petitioner's titles, although fully apprised of their existence, by their being deposited in the land office; but that he ought to issue patents for subsequent locations upon the said lands. The petitioner admits that his plats and surveys have never been delineated upon the map of the said county of Refngio, but denies that his rights can be affected by a neglect of the county officers to perform their duties; that his titles were all obtained in good faith, and for sufficient consideration, and were regularly located and surveyed by the proper officers of the country at the time, and in strict conformity with all the laws then in force; and that the principal reason why they do not appear correctly delineated upon the map of the county grows out of the confusion produced in the land office of the said county, by the wars of the revolution, the destruction of its maps and papers, and the impossibility of restoring things to their proper state, by the subsequent almost entire [63] depopulation of the county from the frequent inroads and encroachments of the enemy, thus preventing the transaction of business; and, more especially, the resurveying and plotting of large bodies of wild lands in a country wholly unprotected and peculiarly exposed to the depredations of the enemy. The

petitioner admits that the commissioner cannot correctly delineate upon the map of the county his lands, in consequence of many of his principal calls being for the lands of others, the position of which were well known in the county at the time the surveys were made, but the plats and titles of some of which have been taken from the country, or were lost and destroyed in the general confusion produced by the wars of the revolution; and is apprehensive that before his lands can be surveyed and delineated on the map of the county, under the late law, patents may be issued upon his said lands, unless the commissioner be restrained by the action of the court, and prays an order to the county surveyor requiring him to resurvey all the lands of the petitioner lying in the said county according to the plats and field notes accompanying his titles to the same, and to make out correct plats and field notes to such resurveys, as will enable the commissioner of the general land office to delineate them upon the general map of the surveys of the said county.

The petitioner prays for a writ of injunction restraining the commissioner from issuing patents to the said Joseph F. Smith and others for any of the lands mentioned in the petition, where the surveys are known or appear to have been made upon the said lands, but which cannot at this time be positively determined, in consequence of the defects in the map of the said county in not representing the lands of the petitioner, until the said lands have been resurveyed and plats thereof represented on the map of the county. He further prays that Joseph F. Smith be made a party to this bill, and that he be enjoined and restrained from prosecuting his suit now pending against the commissioner of the general land office, to [64] compel him by *mandamus* to issue patents to the said Joseph F. Smith and others for the said lands, until it can be ascertained whether the lands claimed by the said Smith are not in truth the lands of the petitioner.

Writs of injunction were ordered to be issued in accordance with the prayers of the petition, on the 14th August, 1845; and a writ was issued to the commissioner on the 30th October, 1846.

On the 6th of the said month of October, Joseph F. Smith, one of the defendants, filed his answer representing that the plaintiff's bill was too vague and general to support an action.

2. That his claims by purchase have no foundation in law or reason.

3. That his titles to them were issued by a person who had no authority in law, or if he had, that he transcended that authority.

4. That the titles so issued have no identity as to location, do not conflict with defendant's claims, or, if they do, were made upon surveys that contained from five to ten times the quantities of land called for in the grants, contrary to the laws then in force; the defendant then shows that he claims for himself and others about ten thousand acres of land, the position of which is described with minuteness, and its precise locality designated by dotted lines marking on the county map the surrounding boundary of said lands. He then declares that he has seen the titles of the plaintiff to two and a half leagues of land, and does not think it can conflict with the defendant's claims so identified and designated, and gives his reason for his opinion, founded upon the calls, boundaries, courses and distances of the plaintiff's lands, as set forth in his titles.

The defendant proceeds to describe with the same degree of certainty and minuteness other lands claimed by him as the agent of Joseph E. Plummer, and defines their exact position on the map of said county, and proceeds to say that [65] he has seen certain titles of the petitioner and is very certain that they do not conflict with the lands claimed by him as agent as aforesaid.

The defendant claims also for himself and others twelve sections of land, the boundaries of which are shown on the county map with precision and distinctness; and that he has seen the title of Francisco de la Pena of eleven leagues, claimed by the plaintiff, and that the survey and title is contrary to law, as it has a front of seventy or eighty miles, its legal front being but four and three-tenths miles, and that the title was obtained by false suggestions and fraudulent representations,

and would contain one hundred and ten leagues, which is fraud apparent on its face and would avoid the grant. The defendant then expresses his belief as to various matters of fact, and legal deductions connected with the contract or pretended contract of the empresario to colonize a portion of the ten coast leagues, and alleges that the pretended claims of the complainant were considered too vague and uncertain to be represented on the county map made out by the county surveyor of said county, and the answer and exhibits of the *mandamus* case now enjoined will show that such was the opinion entertained by the commissioner of the general land office.

The defendant filed, subsequently, an amended answer, in which he denies all combination and confederacy with Henry Smith to injure the petitioner, and protests against being connected with any person whatever, and believes it was only done to procrastinate his case, and requires strict proof of all the pretended claims of the petitioner which he cannot, from any knowledge of his own, either admit or deny. He believes that said complainant accepted the compromise allowed by a decree of Coahuila and Texas, allowing him and his partner sixteen leagues, which was more than they were entitled to, as he charges there never were two hundred families settled by said empresarios, in which event the respondent would not conflict with any premium land of said [66] empresarios. He further alleges that Power and Hewitson were Englishmen by birth, and not authorized under the law to purchase lands nor to receive lands as headrights in their own colonies as heads of families.

He further states that all the information was in the county surveyor's office, that is now in the land office, or can be given in relation to the claims of the complainant when the respondent made his entries and surveys, as will appear by an affidavit in one of the cases of *mandamus* now enjoined.

The defendant alleges various other matters, principally in relation to the total vagueness and indefiniteness of the calls descriptive or locative of the complainant's land; of the impossibility of identifying them; that he was anxious in making his surveys to avoid a conflict, and left all the lands which

could possibly be legally claimed by the plaintiff untouched, allowing him his full front as was the customary rule, etc.; that the calls of his four league claim at Live Oak point carry him into the bay, including but four acres of land, etc. Among the papers in the cause is a map of the county of Refugio, which is certified to be a true copy of the copy that was used on the trial of this cause with the exception that it contained another survey, and one of the former surveys was marked with a different number.

The commissioner certifies that this map is a correct copy of the map of the county of Refugio, filed in the year 1841, upon which is not represented all of the titled lands granted by the authorities of Mexico to the colonists of Power and Hewitson and others, but upon which are represented surveys made by the surveyors of the republic of Texas which are placed upon lands granted by the said Mexican authorities by titles.

On the filing of the amended answer, the defendant, who is the plaintiff in error in this court, moved to dissolve the injunction.

The motion was overruled and the defendant sued out his writ of error in pursuance of the 141st section of the act [67] to regulate proceedings in the district courts, page 363, 1 vol. S. L., and this interlocutory decree is alone presented for revision and for the exercise of the appellate jurisdiction.

The question, and the only one for consideration is, whether the injunction should be dissolved, and that, we are of opinion, should be resolved in the affirmative on several grounds.

The first and principal ground is, that the suit was improperly instituted against the defendant, to restrain his further proceedings in his application for a *mandamus* to the commissioner of the general land office, requiring him to issue patents to the identical lands which, as between these parties, are litigated in this action.

The petition of the defendant for a *mandamus* had been filed several years previously, and among other things it was therein stated that he, the applicant, had heard that the lands claimed by him were claimed by others under old titles which, upon several grounds, were alleged to be null and incapable

of delineation upon the map of the county, and an order was made for a publication for three months in a newspaper, of a notice to all persons to come forward and contest the application if they should so wish.

The fact of the actual publication of this notice is immaterial. The plaintiff had full knowedge of the application for the *mandamus*, as is manifest from his prayer to restrain all further proceedings in that suit.

If the return of the commissioner of the general land office to the rule to show cause why the *mandamus* should not issue had disclosed the names of the grantees claiming the lands under older titles, coupled with the declaration, as was the case in his answer, that the field notes of these older titles would be transmitted as speedily as possible to the surveyor of the county, it would have been the duty of the applicant for the writ to have summoned, by proper process, the grantee so named, as it is a well established rule in applications [68] for a *mandamus* that all persons principally interested in the defense must be included in the rule to show cause. 3 Burr. 1453; Willcock on Corporations, p. 209.

The applicant being under obligation to summon the parties interested, when known, their correlative right to appear voluntarily for the protection of their interests is indisputable, and this right securing to them all the advantages, at least in actions relating to the subject matter of these suits, which could be derived from a separate action, it became the duty of the plaintiff, on ascertaining the institution of the suit for the *mandamus*, to have appeared in defense of his rights.

A separate action, so far as this defendant is concerned, is but a multiplication of suits and of the vexations of litigation. This result is to be avoided where that is possible without injury to the rights of the parties litigant, and on this ground a cross action to litigate between the same parties, the same rights involved in the case for the *mandamus*, should have been dismissed.

And if such action could not have been maintained against the defendant individually, it is entitled to no countenance where he is involved with other defendants having distinct

interests, and against one of whom a different remedy is sought to be obtained.

The doctrine advanced in argument, that an injunction cannot issue to restrain a writ of *mandamus*, will not be discussed.

The truth of the position is doubted in cases where private rights are involved, and where it can be shown that the claimants were deprived of defenses which could be set up in a cross petition. Montague v. Dunman, 2 Vesey, Jr. 386; Eden on Injunctions, p. 32. But the ground on which this action cannot be maintained as against the defendant is, that all the objects which can be accomplished by its prosecution could have been attained by contesting the application for the writ of *mandamus*, and if the suit cannot be sustained, *a fortiori*, the injunction should not have been issued, and should on [69] this ground have been dissolved, and probably would, had the attention of the court been directed to the point, either by the answer or argument of the defendant.

This, however, was not the case, nor has it been adverted to in the argument here; but the proceeding, as against the defendant, is so palpably erroneous that we deemed it proper to refer to it, although but cursorily, and determine its effect so far as it operated on the question before the court, viz.: the dissolution of the injunction.

We are of opinion that this injunction should be dissolved on the ground, also, that the term for which it was prayed and that to which it was limited by law has long since expired.

This had expired before the hearing of the cause at the last term, but as it was not adverted to in the argument of the defendant, the fact escaped the attention of the court, or the injunction might then have been dissolved.

To a more correct understanding of this ground, it will be necessary to recur, very briefly, to some of the constitutional and statutory provisions, by which an attempt has been made to discriminate between lands that are subject to location and those which are to be regarded as private property, and by which the officers of the government are to be directed in the

surveying and patenting of lands. The constitution of the republic declares that with a view to the simplification of the land system and the protection of the people and the government from litigation and fraud, a general land office "shall be established where all the land titles of the republic shall be registered and the whole territory of the republic shall be sectionized in a manner to be hereafter prescribed by law, which shall enable the officers of the government, or any citizen, to ascertain with certainty the lands that are vacant and those lands which may be covered with valid titles."

Had this provision been carried out by legislation, in accordance with its spirit and intention, there would have been [70] no difficulty in ascertaining what lands were public and what were private property, and, consequently, what lands are subject to appropriation in satisfaction of land claims against the government.

This might have been done by applying some tests by which the validity of the title could have been determined before registration, but has been very imperfectly effected by requiring, as was the case, "all titles and documents whatever which relate to lands, and which, by the laws now or hereafter existing in Texas, have been and are considered as archives, to be deposited in the land office." Laws of Texas, 2 vol. p. 44.

By this and other similar provisions, all the original documents in relation to lands are thrown in one indiscriminate mass into the land office, without distinction between those which were annulled and those which were recognized by the government, and without determining any question positively affecting the validity of the titles.

The legislation in relation to the maps of the counties seems to have been intended, when fully executed, to point out at least *prima facie* what lands are public and what private property.

By the fortieth section of the land law of the 14th of December, 1837, the several counties were declared sections, and a map of the said section was required to be made, on which plats of all the "deeded lands" in the county were required to be preserved "so as to make a fair showing of the same."

This showing should have had but one object, and that is, to indicate the lands covered by valid titles, but that purpose is not accomplished by requiring all deeded lands to have a place on the map, without distinction between valid titles and those which were mere nullities, or had been declared so by the constitution.

The delineation of deeded land on the map of the county is not made conclusive evidence of the validity of the title, and the want of this representation, when occasioned by [71] circumstances of a temporary character beyond the control of the claimant, or by the neglect or fraud of the officers of the government, should not prevent its subsequent delineation, if it be susceptible of identification.

In all subsequent legislation on this subject, the delineation of the surveys of land on the map of the county is treated as a matter of importance, and constitutes primarily the guide to the surveyor in the locations and surveys of land, and to the commissioner in the issuing of patents.

By an act, approved February 4, 1840, the county surveyors, in nine months from its passage, were required to make out and transmit to the commissioner of the general land office, a map of their respective counties, in conformity with the provisions of the law of the 14th December, 1837, p. 182, vol. 4, Laws; and, by act approved on the following day, at the same session of congress, the commissioner of the general land office was required to make out and forward immediately to the surveyors of the several counties, a full and complete copy of all the field notes of all the surveyors which have been returned to the said office, made within any such county previous to the closing of the land offices in 1835, p. 191, vol. 4, Laws, and it was made the duty of county surveyors to keep in their offices, free for the inspection of all persons, a map, on which all the surveys in their respective counties shall be laid down and properly connected, and which map shall be corrected at the end of every month.

By an act approved January 19, 1841, p. 64, vol. 5, Laws, the commissioner of the general land office was peremptorily required, forthwith, to make out patents on all claims which may

have been or may hereafter be returned as genuine, with a proviso in another section that no patent should be issued on any claim unless a map of the county in which the same is situated shall have been returned to the general land office by the surveyor of the county.

By these various provisions, all "deeded lands" and all [72] surveys returned to the general land office, and made before the closing of the land offices in 1835, are required to be delineated on the maps of the counties, and on the return of the map of the county in which the land claimed to be patented is situated, the commissioner is required to issue forthwith a patent for the same.

The presumption from this course of legislation is, that all the lands covered by former surveys are exempt from location, and the remainder belongs to the public domain, both of which presumptions, however, may be rebutted by evidence appropriate to the issue, and upon which it is not necessary to enlarge.

It is a cardinal principle, that claims against the government are to be satisfied out of vacant lands, but the map of the county is the only guide furnished the commissioner by which these can be ascertained; and where there has been no default on the part of the county surveyor in making out the map according to the provisions of the law on the subject, and none in the commissioner in transmitting such surveys for delineation as by law he is required to do, it would seem that the commissioner, as a general rule, is fully authorized, and it becomes his imperative duty, to issue patents for lands not represented on the general map of the surveys of the county.

In cases similar to the present, however, where it is shown that the delineation of the field notes was prevented by uncontrollable events, some reasonable period for that purpose, deducible from all the circumstances of the case, should be allowed.

The general legislation on the subject is of so indefinite a character that it is impossible to establish any fixed rule applicable to all cases.

The discretion to be exercised by the commissioner, or per-

mitted by the courts, in delaying a patent, must, however be a reasonable one, and more especially, as the valid rights of the older claimants are not concluded or impaired by the issue [73] of the second grant or title, unless those rights had, upon proper issues made between the parties, been adjudicated previous to the issue of the second title.

The plaintiff is fully aware of the necessity under the laws of the land, of having his surveys delineated on the map of the county, and, after stating the difficulties by which it was prevented, declares that he had succeeded after great efforts, in obtaining the passage of a law requiring all the lands held under old or Mexican titles in the county of Refugio, to be resurveyed at the expense of the owners thereof, and the plats of the same to be correctly delineated upon the general map of the said county, as a guide to direct the commissioner of the general land office in the issue of patents. He is apprehensive that the time allowed by the statute to make these surveys would be too long to save him harmless, unless in the mean time, and until his lands can be resurveyed, the commissioner be restrained from issuing patents for locations upon his said lands.

He expresses his consciousness of the difficulties attending the resurveys, but believes that the greater part of his can be identified, resurveyed and delineated upon the general map of the county, and prays for an order of survey for that purpose, and for an injunction to restrain the commissioner from issuing patents until the resurvey can be made. There is no intimation in the petition, that even the full time given by the statute would be necessary to complete the resurveys, but the opposite inference might be drawn from the statements of the plaintiff.

By the statute referred to, pp. 77–8, vol. 9, Laws, the owners of lands under old titles in the counties of Refugio and San Patricio were allowed two years from February 1, 1845, to have their lands resurveyed, and certified plots of the same returned to the commissioner of the general land office, which, when so returned, were to be delineated upon the general map of the county in which they lie.

This statute afforded extraordinary privileges, and the prayer [74] of the petitioner was not for an extension of the time given by the statute, but that he should be allowed before the issue of patents, a sufficient time for the resurvey of his lands. The term given by the statute has expired more than twelve months, and as the injunction was prayed expressly to restrain the commissioner until the resurvey could be effected, there is no good reason for its further continuance.

As this ground, so far as it depends upon the expiration of the statute, and not on the reasonable length of time claimed by the petitioner for his resurveys, did not and could not have entered into the consideration of the court below, we might have hesitated to dissolve the injunction on it alone, and perhaps would have directed the court below to order its dissolution. There can be but slight doubt of our power to have acted directly on the restraining order, as the cause of dissolution springs out of the operation of law, and its result could not in the present state of the pleadings be changed by any act of the parties other than the voluntary consent of the defendant to the continuance of the injunction.

I now proceed to examine whether, on the allegations of the original or amended answer, the injunction should have been dissolved.

The general rule on the subject is, that where the answer denies all the circumstances upon which the equity is founded, the injunction will be dissolved as a matter of course, otherwise it will be continued to the hearing. 1 Johns. Ch. 211; Eden on Injunctions, p. 86; 8 Ves. 35; Drewry on Injunctions, p. 424.

The object of this injunction was to restrain the defendant from procuring patents, until sufficient time was allowed for the resurvey and delineation of the lands, claimed by the plaintiff, upon the map of the county, and circumstances were alleged as entitling him to this extension of time. It was stated also, that the defendant well knew that at the time of making his locations, the lands were not vacant, but that they were private property, legally owned, held and [75] possessed by the plaintiff, and that the location and surveys of the defendant were made in fraud of the plaintiff's rights.

The defendant does not deny in his answer the circumstances stated of the destruction of the papers, maps, etc., by the events of the war, constituting the ground of the plaintiff's application to a court of equity, nor in his original answer, is the existence of the plaintiff's title denied, but he alleges various grounds in their avoidance, and that they do not conflict with the claims of the defendant, or if they do, it arises from their including a vastly greater amount of lands than called for by the deeds. In his amended answer he requires strict proof of the ownership of the plaintiff's claims, as he cannot, from any knowledge of his own, admit or deny them. There is no express denial of the ownership alleged by the plaintiff, and if there were, it is in effect contradicted by the original answer.

Had the allegations of the petition, stating the facts upon which the plaintiff claimed further time for the resurvey of his lands, been contradicted, the injunction would not, as a matter of course, have been dissolved. The statute referred to in the petition gave the plaintiff, with others, further time for the resurvey of his lands, and its legitimate effect was virtually to suspend the issue of patents during its existence in all that portion of the county in which lands were claimed under titles issuing from the former governments of the country. There might be exceptions to the general rule, as the statute does not confirm titles which were invalid; and there may be some which, on their faces, show a total impossibility of identification, and consequently of resurvey. Under such circumstances the patents ought not to be delayed until the expiration of the two years allowed by the statute.

The defendant alleges in his answer that the plaintiff's bill is too general and vague to support an action. This exception, if sustained, would dismiss the petition, and of course would operate a dissolution of the injunction. But we are of opinion that it is not well taken, and that there is sufficient [76] certainty in the averments to support the action, and authorize the restraining action of the court.

Another ground taken in the answer is, that the plaintiff's claims by purchase have no foundation in law or reason.

This is a grave objection. It cannot be considered, however, on this appeal from an interlocutory order, unless the titles to which the objection is made had been filed as exhibits. For, on the question before the court, we can only notice such causes of nullity as are apparent on the face of the titles, and not such as require proof for their establishment of facts.

The defendant, in a subsequent part of his answer, expresses his belief that if the general government did give the state power to colonize the ten coast leagues, it did not give the state the power to sell the lands within the ten coast leagues, and that if the plaintiff had a colony, eleven league grants were excluded by the terms of the contract. What these terms were is not within our judicial knowledge, as the contract was not made an exhibit in the pleading, and we cannot therefore determine whether by its terms eleven league grants were or were not excluded.

The hypothetical proposition or belief, that if the general government did authorize the disposition of the coast leagues in one mode, it did not do so in another, is too vague and general to have relation back to the exception at the commencement of the answer, that the plaintiff's titles by purchase were not founded in law or reason.

This expression of belief extends to all the ten coast leagues of the state, and to the acts of the general government on the subject matter throughout that whole scope of territory.

That government may have authorized the sale of these lands to the plaintiff, and yet have given no general authority for the sale of the coast leagues, or it may have approved of the sale of other lands, and not have sanctioned the titles of the plaintiff.

Had the defendant intended to charge this want of the [77] previous approbation of the supreme national executive, as a cause of nullity destroying the titles of the plaintiff, he should have averred the fact positively, and as specifically affecting the special grants of the plaintiff; and had the title, with the want of such approbation, been then exhibited, a tangible proposition would have been presented to the court

for definitive solution.   But the question, if it can be considered as suggested by the answer, is made with so much indistinctness, and such a want of specific application to the particular titles in litigation, that we do not feel called upon to determine the effect of the want of such approval by the general government of a title made within the coast or border leagues; a question of vast importance, whether we regard the principles or the amount of property involved in the decision.

It will not be necessary to continue the examination of the defendant's answer.   The facts in relation to the want of authority on the part of the officer who executed the titles, and in relation to the boundaries, are matters of proof and cannot affect the question now made before the court.

The legal effects of such facts, as relate to the excess of lands claimed under a deed, can be determined when the facts themselves are established.

The allegations of the answers do not, severally, or taken together, present any clear ground for the dissolution of the injunction before the hearing of the cause.   The new matters, or some of them, set up in the answer by way of belief or assertion, when established upon evidence, may doubtless materially affect the rights claimed by the plaintiff, but form no ground for an interlocutory order to dissolve the injunction.

Had the injunction not been dissolved on other grounds, it might perhaps have been dissolved on the ground of multifariousness.   But, as this is a doubtful right, and as the question has been disposed of on other grounds, the expression of any opinion on that point has become immaterial.

The lands claimed by the defendant, either for himself [78] or others, as attorney of Jos. E. Plummer, are specifically distinguished on the map of the county in the record by dotted lines marking their surrounding boundaries.

It is ordered, adjudged and decreed that the judgment overruling the motion to dissolve the injunction be reversed, and that the injunction issued against the commissioner of general land office be dissolved so far as it restrained the said commissioner from issuing patents to lands included within

the said dotted lines or boundaries, and that the injunction restraining Joseph F. Smith, the plaintiff in error, from prosecuting his application for a writ of *mandamus*, be and the same is hereby dissolved, and the cause remanded to the district court.