## JOHN TABOR v. THE COMMISSIONER OF THE GENERAL LAND OFFICE.

Though it is apparent that, by the 2d section of the act of February 11, 1858, (Paschal's Dig., Art. 4423, Note 990,) and the amendment thereto of February 1, 1860, the legislature intended to bring into market the islands as well as the "reserved" sections therein mentioned, yet no mode has been expressly provided by these or any other enactments for the sale of the public lands upon the islands. The mode of sale established by the 4th section of the act of February 11, 1858, (Paschal's Dig., Art. 4425,) is appli-

cable only to the "alternate sections of land surveyed and reserved to the State," referred to in the 2d section of the act, and has no application to the islands.

The failure to establish a mode for the sale of the public lands upon the islands appears to have been an oversight upon the part of the legislature, though it may be said with plausibility that it was intentionally left for future legislation.

A survey of public land made while the land was reserved to the State is void and unofficial, whether made by a public surveyor or a private person, there being no lawful authority for a survey of reserved lands. (Paschal's Dig., Art. 4248, Note 972.)

*Quære?* Whether the commissioner of the general land office is invested with discretionary powers, by virtue of which he is authorized to adapt to the islands the general plan of the State for the sale of her lands by the issuance of certificates, &c.?

If the commissioner has such discretionary power, his exercise of it will not be reviewed on an application for a mandamus.

The writ of mandamus will not be granted against a public officer, unless the right of the applicant be clear and unquestionable, and unless the duty of the officer be clearly defined and enjoined upon him by law, and be ministerial in its nature, and not involving any judicial function, discretion, or alternative.

Where a mandamus against the commissioner of the general land office is sought for the purpose of procuring title from the State to public land, and it appears that there are other claimants of the land who are not parties to the proceeding, that fact of itself furnishes sufficient reason for the refusal of the writ. The averment of the applicant, that the claims of such other persons are void, will not obviate the difficulty; for, whether void or valid, the courts will not undertake to adjudicate unless the claimants are parties to the suit.

APPEAL from Travis. The case was tried before Hon. A. W. TERRELL, one of the district judges.

This case was an application made by the appellant for a mandamus to Francis M. White, as commissioner of the general land office.

The essential facts are stated in the opinion of the court, and need not be repeated here.

Commissioner White, in his reply to Tabor's application, after explaining his construction of the acts of the legislature involved in the question, proceeded as follows: "Then, as the law fails to point out the mode by which

the islands can be disposed of, and as the making of surveys without a certificate authorizing the same is prohibited under heavy penalty, it remains to be seen whether the commissioner may exercise a discretion, in order to carry out the plain intent of the legislature, and in what way that discretion is to be exercised. If exercised at all, it should only be to carry out the evident intention of the legislature: it should be practical and uniform in its application. In regard to the exercise of a discretion in the premises, I presume that you deem it expedient and necessary, because your application begets that necessity, as the law is clearly inoperative when viewed strictly according to the letter. We have already adopted a plan, in the exercise of a discretion, which we believe meets the intention of the legislature; which is, to sell island scrip at $1 25 per acre, to be located upon any of the islands, under the general laws regulating surveys. I admit that this plan is the result of discretion, and not sustained by positive law; yet I can see no good reason for its abandonment in order to adopt a different discretion, which would be equally unsustained by law.

"I therefore respectfully decline issuing the order, for the following reasons:

"1. There has been no legal survey of the land, which is always necessary before a patent can issue.

"2. The act under which you claim does not point out any mode by which the islands shall be sectionized, other than that adopted in ordinary cases where public lands are required to be surveyed. In the absence of any specific mode being pointed out, the office has adopted a plan corresponding with the usual mode in our State, and, I believe, better calculated to facilitate locators or purchasers, protecting the interests of the State, and different from the one which is proposed by you.

"3. There is a prior application, or applications, for the land, or a portion thereof, backed by surveys of the same,

which I believe to be valid, and of which you had notice before making your application."

The errors assigned are, that the court below erred in sustaining the exceptions of the defendant and in dismissing the plaintiff's petition.

*Hancock & West*, for appellant.—The commissioner, in his letter, it will be perceived, admits (as indeed is plain) that it ·was the intention of the legislature to sell the islands; but he contends that they have failed to point out a mode, and that they cannot be identified and designated, and hence refuses to act.

The obscurity, or rather hiatus, that the commissioner supposes to exist, springs from a misunderstanding of the use of the word "sections;" that word occurring in both the 2d and 4th sections of the act, but not used in the sense and with the meaning attached to it by the commissioner.

It is equally clear to us, (bearing in mind that it was the legislative intention not only to sell the alternate sections, but the islands also,) that in the 4th section the words "section and sections" are used in their common and more enlarged sense, to wit, to mean six hundred and forty acres of land.

This view is confirmed by the phraseology of the 4th section itself; the language used is, one or more sections of the land treated of in the 2d section, to which it immediately directs the mind of the reader.

Had it been intended to restrict the words to the "alternate and reserved sections" treated of in the 2d section, the terms would have been "one or more of the sections referred to," but no such restriction was contained, and it refers expressly to the "land" mentioned in the 2d section, manifestly including them all.  Nor is this use of the word section, as synonymous, in this connection, with "six hundred and forty acres of land," at all uncommon,

in the sense in which we contend: it will be found repeatedly in our land legislation. (Hart. Dig., Arts. 1828, 1960, *et seq.;* 2011, *et supra, et seq.;* 2231, *et seq.;* O. & W. Dig., Art. 1666, *et seq.*) In all of these instances the term section will be found to be a general term, with a meaning familiar to all. And in Webster's Unabridged Dictionary we find the word section defined to be, "in the public lands of the United States a tract of six hundred and forty acres of land."

Furthermore, by reverting to a few elementary rules for the construction of statutes, our view will be found to be sustained by authority. If, for example, our view be rejected, and that of appellee be adopted, the law, so far as the sale of the island is concerned, will become a dead letter, clearly contrary to the intention of the legislature. And Smith on Statutory Construction, pp. 671 and 672, and § 527, lays down the rule, "that a statute should never be so construed as to render it a nullity," and there fully illustrates and applies the rule. And again, on p. 673, and in § 528, he lays down the rule, that if a statute makes use of a word in one part of it susceptible of two meanings, the one favorable to and the other hostile to its principal design, the former should prevail and control the construction. Surely no rule of construction could be more in point than this. (See as authority strongly in point 2 Vatt. c. 2, p. 285.) This rule of construction is sanctioned by our court. (Randolph v. The State, 9 Tex., 521; Cannon v. Vaughan, 12 Tex., 401, see opinion of chief justice; Robinson v. Varnell, 16 Tex., 382; Brooks v. Hicks, 20 Tex., 666.) Another rule is, that the true meaning of the statute is generally and properly sought for and ascertained from the purview and body of the act; that is, in construing the words and collecting from them the intention of the legislature, regard must always be had to the subject-matter. (Smith's Comp., 709 and 710.) Again, on page 633, Smith lays down the rule, "No statute should be so construed as to

be of no effect; and the true rule is, that if many different interpretations present themselves from the language in which the law is expressed, and any one of them will enable us to avoid such an effect, that should be preferred which appears most agreeable to the intentions of the framers of the statute, for that would be most conservant to the true office of interpretation." (See also his remarks on page 634.)

On page 828, and section 713, will be found a case forcibly and fully illustrating these principles. Furthermore, it will be perceived that the object of the sales was the beneficent one of increasing the school fund, and the court will hesitate long in such a case, when the object of the act is known and the intention certain, in adopting a construction that would render the statute a dead letter. But it is further argued by the commissioner, that he has no mode of pointing out and designating the land, and that to adopt the mode suggested by us would breed confusion. There is no force in this position.

The commissioner of the general land office has in his office, as the legislature well knew, the maps of all the islands in the state, (and they are not very numerous.) The applications are to be made to him first in every instance under the law, and the law makes it the duty of the applicant to precisely designate the section that he desires, and the commissioner of the general land office can then number it, if the designation is not sufficient to plat it on the maps and fully identify it. (The State v. Delesdenier, 7 Tex., 76.) The general land law of 1837, Art. 1164, O. & W. Dig., p. 271, clothes him with power to issue instructions to the district surveyor in whose district the land may be, and have it properly designated. It is a power inherent in the office and daily exercised. (Lake v. Wafer, 16 Tex., 570; Chadoin v. McGee, 20 Tex., 476.) The law does not require an actual survey. In some cases a survey may be needed, and where needed the commissioner of the

xxix—33

general land office need not issue the order to the treasurer until the land is designated satisfactorily. In other cases no survey may be needed. In this case there is no pretense that the land cannot be precisely identified or designated; the only objection is, that it has not been legally surveyed, when the law does not require a survey at all, though it is in the power of the commissioner of the general land office to order one under the law just cited if it should be necessary. We feel confident that the court will not hold that the legislature has stultified itself, and that it has provided a mode for disposing of the island.

It might be objected that we have not brought Shaw and Walworth before the court, who have floating island scrip of one hundred and sixty acres located on this land. It might be sufficient answer, even if their claims had any standing in court, to say, that as yet the appellant is not in a position to question their locations at all. Should he receive the order to pay the money, and pay it, and then demand a patent, it might be necessary, before he could obtain it, for him to have their void locations canceled; at present they could in no sense be properly before the court.

Furthermore, the commissioner of the general land office admits in his answer that their certificates issued without authority of law, and it is perfectly clear that he has no power (as the court will perceive by a moment's examination of the act) to issue one hundred and sixty acres floating certificates, to be located anywhere except on the vacant public domain. They could not be located at all on the island, nor under the law can they be located on' the island. These propositions are clear, and hence these floating certificates are void on their face, and confer no right at all as to the supposed power to issue them contended for by appellee. ( *Vide* Smith, pp. 777, 778.)

*George Flournoy, Attorney General,* for appellee.—If there be no discretion in the commissioner to adopt a plan for

carrying into effect the legislative will, then the law, so far as the islands are concerned, is a nullity, there being no mode pointed out; but, if the discretion rests in the commissioner for adopting a plan for effecting the object contemplated by the legislature, then the commissioner announces that he has exercised that discretion, and is not subject to mandamus. Repeated decisions of this court have affirmed the well-known rule, that a public officer cannot be controlled in the exercise of a discretion vested in him by law.

Finally, the commissioner assigns the conclusive reason for refusing the application of appellant, that "there is a prior application or applications for the land, or a portion thereof, backed by surveys of the same, which I believe to be valid, and of which you had notice before making your application."

The appellant insists that these prior locations of Shaw and Walworth are null and void, but the court could not undertake to adjudicate upon their claims, they not being before the court. The appellant insists that he was not in a position to bring them before the court, and would not be until the commissioner had issued the required order to the treasurer, the money had been paid, the receipt presented, and a patent demanded. But the court will see at once that it would have been then too late for the commissioner to refuse to issue the patent. The issuance of the patent would have followed, as a matter of course, upon presentation of the treasurer's receipt, and the commissioner would be estopped by the issuance of his order from refusing the patent.

The whole question came up for adjudication by the commissioner on presentation of the application designating the land and demanding the order to the treasurer to receive the money therefor. Shaw and Walworth or have been and should have been made parties to the suit. It is the common practice in mandamus suits against sur-

veyors refusing to survey land located to join in the suit an adverse claimant.

The commissioner's answer sets up that there are prior applicants for the same land, and the appellant's petition discloses who they are. The court could not undertake, in their absence from the suit, to adjudge their rights, or that their claims were void; and their existence, recognized as valid by the commissioner of the general land office, was a sufficient reason for the refusal of appellant's application, until the rights of said applicants and the appellant to the land in controversy were adjudicated.

SMITH, J.—On the 26th June, 1860, Tabor applied to White, commissioner of the general land office, to purchase six hundred and forty acres of land on Brazos island, in Cameron county, under Arts. 1221 and 1223, O. & W. Dig., the former as amended by act of February 1, 1860. (Laws of 8th Leg., p. 30,) [Paschal's Dig., Arts. 4423, 4424, Note 990.]

In his application he states the section to be the same that was surveyed 26th May, 1847, for L. Dobbins, by virtue of Thomas Toby's scrip No. 185, by the surveyor of San Patricio county; the field-notes of which, set out in his petition, were on file in the land office at the time of his application to purchase this survey as a section of land within the meaning of said articles.

The six hundred and forty acre tract conflicts in part with two surveys, of one hundred and sixty acres each, previously made. Tabor avers these surveys null and void, because the certificates in virtue of which they were made had been issued by the commissioner of the general land office without any authority of law, express or implied, direct or discretionary, and must be wholly disregarded.

The commissioner declined to give the order to the treasurer to receive the price fixed upon the land by law, ($800,) and Tabor instituted this proceeding by mandamus

to compel him to give the desired order to the treasurer to receive the money for the land at $1 25 per acre.    White appears, and excepts to the petition for want of merits, and the exception is sustained and cause dismissed, and Tabor has appealed to this court.

The special act of February 11, 1854, granting ninety-four sections of land, of six hundred and forty acres each, to the Galveston and Brazos Navigation Company, and also the act of January 30, 1854, to encourage the construction of railroads in Texas, by donation of sixteen sections to the mile, (O. & W. Dig., Art. 1666,) made it the duty of all these favored companies to locate and survey the land so designated into sections of six hundred and forty acres each, in square blocks not less than six miles, unless prevented by previous surveys or navigable streams, and to delineate such surveys upon maps, coloring differently the even and odd sections, which were to be regularly numbered from one upwards to the full number contained in the block.    The field-notes of these surveys and maps the respective companies were required to deposit in the general land office.    (O. & W. Dig., Art. 1668,) [Paschal's Dig., Art. 4947, Note 1081.]

The commissioner is directed to issue patents for the odd sections to the railroad companies, while the even or alternate sections of land, surveyed as aforesaid, are reserved to the use of the State, and were not liable to location, entry, or pre-emption privileges, until provided by law.    (O. & W. Dig., Art. 1677,) [Paschal's Dig., Art. 4956.]

It will be remembered that the islands had been reserved from location and survey, and none of the *bonus* lands of these companies could ever have been located and surveyed on any of them.

Article 1221, O. & W. Digest, as amended by act of 1860, (Laws 8th Leg., p. 30,) reads as follows, viz: "The alternate sections of land surveyed and reserved to the State, under the provisions of the laws to encourage the con-

struction of railroads by donations of land, and the act granting land to the Galveston and Brazos Navigation Company, and the islands heretofore reserved, and all other reserved sections, may be sold at $1 25 per acre: *Provided*, That fractions of less than one hundred and sixty acres, within the Memphis, El Paso, and Pacific railroad reserve, and that have not been surveyed by the company, shall be subject to settlement and sale, or either, at fifty cents per acre, as hereinafter provided for by this act." [Paschal's Dig., Note 990, p. 729.]

It is apparent that the legislature intended by this act to bring into market all the "alternate" and "reserved" sections of land in the State that had been surveyed by the railroad and other companies and reported to the general land office by them, with the field-notes of each section delineated and numbered upon the map, and also the islands that had been reserved from sale; but there is nothing in this section that would authorize the surveying or sectionizing of the islands, nor do we know of any express law that does.

Article 1223, O. & W. Digest, under which Tabor claims the right to purchase the land as a section, reads as follows, to wit: "Any person desirous of purchasing one or more sections of the land mentioned in the second section of this act, (O. & W. Dig., Art. 1221,) shall make application to the commissioner of the general land office, stating the section or sections he desires to purchase; and thereupon the commissioner of the general land office shall give to the applicant an order to the treasurer of the State, directing the treasurer to receive from the applicant the price of the section or sections he desires to purchase, stating the name of the purchaser, and describing the section or sections applied for by number; and the treasurer, upon payment of the price, shall give to the purchaser a receipt in like manner, stating the purchaser's name, and describing the land; and upon presentation of said receipt to the com-

missioner of the general land office he shall issue to the purchaser a patent or patents for the lands so purchased and paid for." [Paschal's Dig., Art. 4425.]

This section of the act only authorizes the commissioner to give the order to the treasurer, to receive the price of the land, and to issue the patent for those sections of land referred to in Art. 1221, (O. & W. Dig.,) [Paschal's Dig., Note 990,] which are the "alternate sections" of land "surveyed" and "reserved" to the State under the provisions of the laws to encourage the construction of railroads by donations of land and the act granting land to the Galveston and Brazos Navigation Company, which sections, it is pre-supposed, are surveyed, delineated, and numbered upon the maps deposited in the office of the commissioner, in conformity with law. It enacts simply, that upon presentation of the receipt of the treasurer for the price, he shall issue a patent to the purchaser for the section or sections purchased and paid for by him. It does not provide for the survey or legal identification of the sections other than what already appears in the office.

There certainly is nothing in either of the articles quoted, and under which the appellant claims, that expressly fixes the mode for the sale of any part of the islands. Nothing can be sold under these sections of the law but the "alternate and reserved sections" of lands that have been surveyed in a legal manner and as aforesaid.

The appellant claims a section of land surveyed in 1847, by virtue of Thomas Toby scrip No. 185. This survey and field-notes are void and unofficial, from the fact that the surveyor had no authority to make the survey, the islands then being reserved from location. It is nothing more than a survey made by a private person unofficially, and must be so treated by the commissioner. (The State v. Delesdenier, 7 Tex., 76; Linn v. Scott, 3 Tex., 67.)

The legislature evidently intended to place the islands in the market for sale at $1 25 per acre, as well as the reserved

sections of land, as before mentioned. But in the section No. 4, (Art. 1223, O. & W. Dig.,) which was intended to provide the mode of selling and making title to the lands thus brought forward into market, the legislature has only expressly provided for the sale of the alternate and reserved sections, and not for the sale of the islands, or any part of them; and we know of no law that does expressly authorize the sale of them. It appears to be an omission or oversight in the legislature—a *casus omissus;* and we know of no law that would, by implication, authorize the sale in the manner desired by the appellant.

There being no express mode prescribed for the sale of the islands, the commissioner thinks he is invested with a discretionary power, and in the exercise of that discretion has adopted the general plan of the State for locating and surveying certificates to the islands issued by him. It might be asked by what authority he issues the floating island certificates, any more than the county court or any other tribunal of the State which has been in the habit of granting or issuing certificates? It may be said with some plausibility, that the legislature designedly omitted to provide a mode of selling the islands at that time, in the same manner that the constitution of the Republic fixed the head-right of persons who were residents of Texas on the 2d March, 1836; but, to perfect their rights, further legislation was necessary.

But if it be admitted that he has discretionary powers, and in the exercise of that discretion has adopted a plan different from that proposed by Tabor, we must hold that the action of the commissioner in this respect will not be reviewed by us on this proceeding for mandamus. The writ will not be granted against a public officer unless the right be clear and unquestionable, and the duty as clearly defined and enjoined upon him by law, and which is ministerial in its nature, and involves no judicial function, discretion, or alternative. (3 Tex., 51; 5 Tex., 471; 12

Pet., 524; 22 Tex., 24;) [Paschal's Dig., Art. 4248, Note 972.]   And, on the other hand, if it be admitted that he has no such discretionary powers in respect to the mode of selling the islands, then it follows that he has none at all, either express or implied, absolute or discretionary, and he will be sustained in refusing the application of the appellant to purchase in the mode designated by him.

If there were no other objection to the application for the writ of mandamus in this case, the fact that there are other claimants to the land, who are not parties to this proceeding, would furnish grounds for refusing it.   The averment that their claims are void will not relieve the matter of the difficulty; for this court will not undertake to adjudicate their claims, whether valid or not, when the claimants are not parties to the suit.   These controverted rights between parties must be settled in a suit in the county where the land lies, before the commissioner can be proceeded against.   (5 Tex., 484; 2 Tex., 57.)

There being no error in the judgment of the court below, it is

AFFIRMED.