Walter ATCHLEY et al., Appellants,

v.

The SUPERIOR OIL COMPANY et al., Appellees.

No. 7351.

Court of Civil Appeals of Texas, Beaumont.

May 25, 1972.

Rehearing Denied June 29, 1972.

884

Pat S. Holloway, Dallas, Crawford C. Martin, Atty. Gen., J. Milton Richardson, Asst. Atty. Gen., Austin, for appellants.

E. E. Shouse, Frederic Johnson, Herbert Varner, Thomas H. Lee, Barrow, Bland & Rehmet, William S. Clarke, Houston, William E. Nicholas, Sinton, Guittard & Henderson, Richard Henderson, Victoria, Warren B. Leach, Jr., Houston, Clayton L. Orn, William H. Holloway, Vinson, Elkins, Searls & Smith, Murray Christian, Herbert W. Varner, R. T. Robberson, David T. Searls, Dave C. McNeill, Jr., Harry M. Reasoner, David T. Harvin, Houston, Morrill & Patton, Beeville, John H. Miller, Jr., John H. Flinn, Dist. Atty., Richard D. Hatch, County Atty., Burnett & Burnett, Sinton, Luther E. Jones, Jr., Corpus Christi, for appellees.

KEITH, Justice.

This is a vacancy case in which the trial court entered a summary judgment in favor of the defendants, finding that no vacancy existed. We review a tremendous record which takes up four drawers of a legal filing cabinet; and, it is obvious that while we must make a lengthy statement from the record, many facets thereof will escape mention.

## I. Statement of Case

Walter C. Atchley, plaintiff below, instituted suit in the District Court of San Patricio County under the provisions of § 6, Art. 5421c, Vernon's Ann.Civ.St., following the rejection of his vacancy application by the Commissioner of the General Land Office. Plaintiff named as defendants hundreds of individuals, oil companies, and other corporations, alleging that the defendants claimed interests in the alleged vacancy or adjacent lands. Plaintiff, pursuant to statute, also named the State of Texas as a party defendant.

The State intervened in the proceedings, aligned itself with the plaintiff, and sought recovery of the land described in plaintiff's petition as well as hundreds of millions of dollars from the several oil companies for the oil and gas produced from the lands in dispute. The State's plea in intervention was in the form of a trespass to try title action, named the same defendants sued in plaintiff's original suit, and sought recovery of the land described in plaintiff's pleadings. Later, during the course of the litigation, the State filed its first amended petition in intervention as a straight trespass to try title suit for the recovery from the defendants title and possession of the land involved in plaintiff's original suit. This action was severed from Atchley's original suit, docketed under another number, and is still pending.

At issue between the parties is the true location upon the ground of the divisional line between the seven and a half league Portilla grant and the void five and a half league Power and Hewetson grant, both of which are located between the Aransas River on the north and the Chiltipin Creek on the south in what is now San Patricio County. The Power and Hewetson grant was adjudicated to be a void grant in a series of cases originating in Smith v. Power, 2 Tex. 57 (1847), which included: Commissioner of General Land Office v. Smith, 5 Tex. 471 (1849); Smith v. Power, 14 Tex. 146 (1855); Smith v. Power, 23 Tex. 30 (1859); Wood v. Welder, 42 Tex. 396 (1875); and Plummer v. Power, 29 Tex. 6 (1867).

The location of the boundary line in question was also the subject of controversy in Welder v. Carroll, 29 Tex. 317 (1867), and in Welder v. Hunt, 34 Tex. 44 (1870).

In bringing our discussion of this basic question into proper focus, a lengthy statement is necessary. To a large extent we take this statement from the brief of the defendants, after examining the record and being convinced of its correctness.

The seven and one-half league Portilla grants comprise a single body of land between the Aransas River on the north and Chiltipin Creek on the south. They were titled to settlers in the Power and Hewetson Colony by the State of Coahuila and Texas on October 23, 1834, in five separate grants. Each grant conveyed a separate and distinct parcel of the seven and one-half leagues. One of the grants for one league was to Felipe Roque Portilla; another for four leagues to four of Portilla's sons; another for one-half of a league to two other sons of Portilla; another for one league to Miguel Musquiz, and another for one league to Antonio Gozeascochechea, the son of Maria Jacinta de la Garza.

Each grant recites that a special plat of the seven and one-half leagues "shall be", or as to one grant, "will be" attached to the title for "security of the interested party." Each title also recites that the lands granted are contained within the survey which one of the appointed surveyors made on the Aransas River.

Portilla and his sons, in the applications for their three grants, state that two years prior to their applications, which bear date of September 11, 1834, they introduced stock into the colony and settled and occupied a ranch on the Aransas.

Each title recites that the lands included in the grant were adjudicated to the colonist named in the title; that he was put in possession; that he took possession "quietly and peaceably without any contradiction, and performing all of the acts of real and true possession; having been informed that within one year he shall construct fixed boundaries and shall observe that part of the Colonization Law which pertains to them."

The original grants (protocols) were deposited in the General Land Office of the Republic of Texas on November 1, 1837, and had been of record for nearly 130 years when this vacancy action was brought. The plats, however, to which the grants refer are not in the General Land Office.

Some seven days after the State of Coahuila and Texas executed the five Portilla titles, it granted to the empresarios Power and Hewetson on October 30, 1834, a tract of land said to contain five and a half leagues. The lands granted to them called to be bounded on the west by lands of Don Felipe Roque Portilla, on the north by the Aransas River, on the south by Chiltipin Creek, and on the east by the confluence of the Aransas and Chiltipin.

The five and a half leagues were described as being "an imperfect triangle," as "shown by the special plat which is attached."

Recitals of the delivery of juridicial possession, similar to those found in the five grants to the seven and a half leagues, are also contained in the grant to the empresarios.

The five and a half leagues granted to the empresarios were some of the lands they had selected under a purchase they made on December 24, 1829, from the Mexican Government of two concessions of eleven leagues each. Their application dated September 23, 1834, states that they acquired by purchase two concessions of eleven leagues each; that they had taken only seven and a half leagues, and asks that ten leagues more "be surveyed and adjudicated" to them between the Chiltipin and Aransas Creeks. Vidaurri, the Commissioner for the Power and Hewetson Colony, approved their application for the

lands requested "provided they are entirely vacant."

In subsequent litigation involving the validity of grants made to the empresarios of lands under the two eleven-league concessions, the Supreme Court of Texas held that all grants under the two eleven-league concessions to the empresarios of lands situated within ten littoral leagues of the coast, which were made by the State of Coahuila and Texas without the approval of the General (Federal) Government of Mexico, were invalid. Smith v. Power, supra (2 Tex. 57); Smith v. Power, supra (14 Tex. 146); Smith v. Power, supra (23 Tex. 30); Plummer v. Power, supra (29 Tex. 6).[1]

Still later, in a trespass to try title action brought by John H. Wood, who had made entries and locations of land certificates on parts of the five and a half leagues titled to the empresarios and conveyed by them to John Welder, the Supreme Court in Wood v. Welder, supra (42 Tex. 396), refused to reopen the question of the validity of the two eleven-league concessions to the empresarios, thus holding that the grant of the five and a half leagues to Power and Hewetson was invalid. As a result of these decisions the State of Texas gained the title to the five and a half leagues which were bounded on the west by lands of Don Felipe Roque Portilla according to the calls in the Mexican grant to the empresarios.

The location of the common line between the lands titled to Portilla and the five and a half leagues titled to the empresarios and recovered by the State was in litigation from September 24, 1853, when Wilkins Hunt brought an action in trespass to try title against John Welder, until January 11, 1872, when a final judgment was entered in favor of John Welder on a jury verdict.

Hunt, the assignee of Johnston Roselle to whom the State had issued a land certificate, made an entry and location on two tracts of 320 acres each. The two tracts were surveyed by the Deputy Surveyor of the San Patricio Land District on June 25, 1853, and field notes returned to the General Land Office, but the State never patented the lands. Hunt contended in his trespass to try title suit that his entry and location and the field notes returned to the General Land Office covered lands in the five and a half leagues which had been invalidly granted to the empresarios; whereas, Welder contended they covered lands in the seven and a half league Portilla grants which he owned. Thus, the controlling issue in the case was the location of the division line between the five and a half and seven and a half league grants.

On the first trial a jury verdict was returned adverse to Welder, who took an appeal to the Supreme Court from a judgment rendered against him. The judgment was reversed and the cause remanded on March 6, 1867.[2]

On the second trial a jury verdict was again returned adverse to Welder, but only after the jury had failed to agree and the parties accepted less than a unanimous verdict. From a judgment entered against Welder, he took his second appeal to the Supreme Court, where the judgment of the District Court was again reversed and the case remanded for a third trial. Welder v. Hunt, supra (34 Tex. 44).

In the third trial a jury verdict was returned for Welder, and a take nothing judgment entered against the plaintiff

1. The Supreme Court of the United States, commenting upon the second and third decisions of the Supreme Court of Texas in the Smith v. Power series set out above said: "We receive the decisions . . . as having a binding force almost equivalent to positive law." League v. Egery, 65 U.S. 264, 267, 16 L.Ed. 655, 656 (1861).

2. The Supreme Court wrote its opinion in Welder v. Carroll, supra (29 Tex. 317), and then in effect adopted that opinion as the reasons for reversing and remanding Welder v. Hunt, supra (34 Tex. 44).

Wilkins Hunt on January 11, 1872, from which no appeal was taken.

The two 320-acre tracts Hunt sued to recover had not been patented to him when he sued Welder nor were such tracts ever patented to him. Instead, he brought and maintained his suit under the Act of February 5, 1841, 2 Gammel's Laws, § 23, 627 at p. 634 (1898), reading as follows:

"Sec. 23. Be it further enacted, That all certificates for headrights, land scrip, bounty warrant, or any other evidence of right to land recognized by the laws of this government, which have been located or surveyed, shall be deemed and held as sufficient title to authorize the maintenance of actions or ejectment, trespass, or any other legal remedy given by law; all laws to the contrary notwithstanding."

The substance of this early statute now appears as Art. 7375, V.A.C.S.

During the course of the third trial, Welder offered in evidence "Map B" mentioned in the opinion of the Supreme Court in Welder v. Hunt (34 Tex. at p. 47), again contending that the line XY thereon was the eastern boundary of the Portilla grants. This is the identical line which defendants now assert to be the true boundary line on the ground.

The map which we find in our record, proved to be a true copy of the one actually introduced in evidence upon the third trial of Hunt v. Welder, located the two tracts claimed by Hunt in the litigation west of the XY line of Map B. The charge of the trial court, also in our record, may be summarized in the following manner.

The jury was told that the question for their determination was the "location of the eastern boundary of a grant by the Mexican Government to Felipe Roque Portilla in 1834."

They were charged that Hunt had shown valid locations and surveys for 640 acres of land claimed in his petition, and was entitled to a verdict, unless Welder had shown a superior title. They were told that for them to render a verdict against Hunt they must be satisfied that the 640 acres sued for were within the boundaries of the Portilla grant.

They were instructed to find for Welder if they were "satisfied from all the evidence that a line was established by the surveyor of the colony which was recognized at the time as separating said tracts," and if they found "that said line was east of and included the old rancho of Portillo" and if they also found that "the lands claimed by plaintiff lies west of said line and Rancho and on the lands claimed by defendant."

The jury found for the defendant, Welder, and judgment was entered in conformity thereto on January 11, 1872,—now more than one hundred years ago.

From certified copies of instruments on file in the General Land Office, we know that shortly after the final judgment in Hunt v. Welder (January 11, 1872), the State patented three surveys immediately to the east of the Portilla grant; and, the three junior surveys each called for joinder to the east line of the Portilla. The *Isaac Clover* certificate was issued on January 24, 1872 and transferred to John Welder on April 10, 1872. After Welder had made his location and entry,[3] the lands were surveyed by James O. Gaffney, county surveyor of San Patricio County. The field notes were filed with the General Land Office on May 31, 1873, endorsed: "Correct on map of San Patricio County June 28, 1873."[4] The patent to the Clover was issued on November 17, 1874.

---

3. Welder's location, entry, and application for the survey was for "the vacant land between the surveys on the Chiltipin and the surveys on the Aransas, bounding west by the Portilla grant and taking the land on the Chiltipin between said Portilla

grant and the Robert Montgomery survey on said creek."

4. "The certificate of the county surveyor as to the correctness of such field notes was necessary before they could be filed

Gaffney's field notes on the *Clover* call for it to begin on the north bank of the Chiltipin Creek "at a stake in L. S. Hatch's yard, the southeast corner of a Mexican grant of seven and a half leagues of land to the Portillas from which the S. E. corner of said Hatch's house bears S 70° W 12½ varas and a hackberry marked W bears S 27° W 19 varas." Thus, the Clover call was for joinder to the Portilla.

The *N. J. Devenny* survey, issued May 24, 1839, was transferred to Welder on April 10, 1872, in the same instrument by which he acquired the Clover certificate. Welder again made his location in the language quoted in the footnote immediately preceding and Gaffney made the survey on March 18, 1873, three days after he had surveyed the Clover just to the south. Field notes on the Devenny were returned to the Land Office on July 5, 1873, and endorsed: "Correct on map of San Patricio Oct 15/73" with the patent issued thereon August 24, 1874.

The calls for the *Devenny* began at the northwest corner of the Clover and concluded at "a stake set on the east line of a seven and a half league grant made by the Mexican Government to F. R. Portilla for the N.W. corner of this survey, thence south with said line 2654.86 varas to the place of beginning."

The *Juan Armendaris* survey, patented on October 10, 1879, called for joinder with the "N.E. corner of a Mexican grant of 7½ leagues made to the Portillas a stake for said corner and the N.W. corner this survey set near the mouth of a gully; thence south with said grant 844 vrs. to the N.W. corner of a survey in the name of N. J. Devenny for S.W. corner of this survey." Similar certifications were made by

Gaffney as were made in connection with the clover and Devenny surveys.

Under instructions then prevailing, issued by Francis M. White, Commissioner of the General Land Office in 1858, Gaffney, as county surveyor, was required to include in field notes calls "for all the adjoining surveys, *if their corners or lines have really been found on the ground*;[5] if not, the fact should be stated."[6] Gaffney did call for the adjoining Portilla grant and thereby certified that such "corners or lines have really been found on the ground."

There is yet another significant fact which emerges from these old records from the General Land Office—the abandoned *Kelly* survey. The John Kelly certificate was issued in 1847, and was transferred to one Egery who caused a survey to be made by William R. Reid, surveyor for San Patricio County. The field notes were filed in the General Land Office on November 11, 1854, and bear the endorsement: "In conflict with a survey of Felipe Roque Portilla titled October 23/34 otherwise correct on map. November 8/73." Again Gaffney made a survey of the *Kelly* on October 8, 1874, and his certificate, filed with the General Land Office on December 4, 1874, stated that the John Kelly "conflicts with a Mexican grant of seven and a half leagues, known as the 'Portilla Grant', according to its present boundaries as defined by a recent decision of the Supreme Court, and as noted by me in making actual surveys near and adjoining the aforesaid Kelly location and Mexican grant . . ." The Kelly certificate was "floated" to other lands.

We note also that significant notations appear in two other instances: The *Amasa*

---

in the General Land Office. His certificate was therefore an official act of a public officer." State v. Sun Oil Co., 114 S.W.2d 936, 945 (Tex.Civ.App., Austin, 1938, error ref.).

5. All emphasis herein has been supplied unless otherwise indicated.

6. These instructions from the Commissioner of the General Land Office, when promulgated became "a part of the law regulating the subject matter to which they refer." Lewis v. Durst, 10 Tex. 398, 415 (1853).

*Turner* two tracts were those involved in the case of Welder v. Carroll, supra (29 Tex. 317), and the *Johnston Roselle* survey involved in the case of Welder v. Hunt, supra (34 Tex. 44). The Land Office records show that the *Amasa Turner* was "floated" on April 29, 1876, because of the conflict with the Portilla while the *Johnston Roselle* was "abandoned" and "floated" on the same day because of its conflict with the Portilla grant.

In three other instances (Alexander *Dunlap,* D. D. *Parmer,* and Wiley *Jones*), the surveys being laid on top of the Portilla grant, bear Land Office notations made in the 1860's that they conflict with the Portilla grant. The locations of the several surveys mentioned are shown upon Map B which we append. Map A is a portion of the official map of San Patricio County from the General Land Office dated August, 1939. The locations of the several surveys material to this case are shown thereon more legibly than on the copy of the General Land Office map dated November 24, 1896; but the locations are identical on each map. It will be seen from an examination of Map A that the Portilla east line and the west lines of the Clover, Devenny and Armendaris surveys are identical and there is no vacancy existing between the Portilla grant and the junior surveys.

The second map, Map B, is a portion of the Blucher Map B mentioned by the Supreme Court in Welder v. Hunt (34 Tex. at p. 47). This map has been relettered so as to more clearly reflect the conditions which are shown upon the original, also in our file. This Blucher Map (Map B) shows the locations of the *Dunlap, Turner, Jones, Roselle,* and *Kelly* surveys just mentioned. It also shows the location of the *Robert Montgomery* survey mentioned in Welder's application (footnote 3, supra) and the XY line mentioned in the Supreme Court opinion.

It is shown as a matter of law by certificates from the proper authorities that: (a)

titles to the Portilla grant have been of record in the General Land Office since being deposited there on November 1, 1837; (b) no suit was ever filed in Travis County by either the Republic of Texas or the State of Texas against Felipe Roque Portilla or his descendants or John Welder and his descendants; and (c) before the plea in intervention filed by the State in this suit, no action of any kind had ever been instituted in the District Court of San Patricio by either the Republic of Texas or the State of Texas seeking to recover the twelve thousand plus acres involved in this suit.

Surveyor Byron L. Simpson prepared the third map, Map C, in connection with the pending litigation. It is to be noted that his vacancy, designated as "M.A. 58291" containing 12,068.37 acres, has as its easterly line the line which is located upon the first two maps as the easterly line of the Portilla grant. This map, if accepted by the court, would tear apart the joinder of the Portilla grant and the junior surveys shown upon the other two maps appended hereto.

## II. *Summary Judgment Rule*

We recognize, as all parties agree, that our review of the contentions advanced by the parties must be made under the rules announced in the recent series of cases by our Supreme Court governing review of summary judgment proceedings. Gibbs v. General Motors Corporation, 450 S.W.2d 827 (Tex.Sup.1970); Harrington v. Young Men's Christian Ass'n of Houston, 452 S. W.2d 423 (Tex.Sup.1970); Torres v. Western Casualty and Surety Company, 457 S.W.2d 50 (Tex.Sup.1970). See also, Great American Reserve Ins. Co. v. San Antonio Plumbing Sup. Co., 391 S.W.2d 41, 47 (Tex.Sup.1965); Tigner v. First Nat. Bank of Angleton, 153 Tex. 69, 264 S.W.2d 85 (1954); and Guidry v. Neches Butane Products Company, 476 S.W.2d 666, 668 (Tex.Sup.1972).

The rule is set out in this language taken from *Gibbs,* supra (450 S.W.2d at p. 828):

"[T]he question on appeal, as well as in the trial court, is *not* whether the summary judgment proof *raises fact issues* with reference to the essential elements of a plaintiff's claim or cause of action, but is whether the summary judgment proof *establishes as a matter of law that there is no genuine issue of fact* as to one or more of the essential elements of the plaintiff's cause of action." (emphasis by the Supreme Court)

Recognizing, as we must, the scope of our review under the decisions just mentioned, we also recognize the rule which is stated in concise form in Blaffer v. State, 31 S.W.2d 172, 191 (Tex.Civ.App., Austin, 1930, error ref.). The court said:

"The public policy of this state, as announced in repeated decisions, demands the security of land titles emanating from the state, and, where ancient boundary lines have been recognized for long periods of years, they will not be lightly disturbed, to the detriment of those who have dealt upon the faith of them. . . . Property rights, extending into the millions of dollars, are based upon that location and its recognition." [7]

Without discussing each of the several points brought forward by diligent counsel representing the vacancy claimant and the State, we affirm the decision of the trial court and now proceed to state our reasons for so doing.

III. *Presumption from Pleading of State*

By their first point, appellants contend that it was error for the trial court to sus-

tain the motions for summary judgment "thereby holding that the summary judgment record conclusively established some fact or facts sufficient to defeat the prima facie case which existed in favor of the State by virtue of the existence on file in the papers of this case of the State's trial pleading."

Whatever may be said for the justness of such a rule as applied to this type of an expropriation action, the existence of the rule cannot now be questioned by an intermediate court. The rule is stated in State v. Post, 169 S.W. 401, 406 [Tex.Civ.App., Austin, 1913; on certified questions, 106 Tex. 468, 169 S.W. 407 (1914); and reversed, 106 Tex. 500, 171 S.W. 707 (1914)], in this manner:

"The court takes judicial cognizance of the fact that the state was originally the owner of all lands in Texas not granted by the government of Spain, or of Mexico or the Republic of Texas, prior to the organization of this state.

"This presumption makes a prima facie case in favor of the state as to any lands for which it may bring suit, and such prima facie case can be met only by showing a grant to such lands. The state is the common source, and whatever title appellee had must have been derived from the state."

Although *Post* involved a grant from the State of Texas, the rule has been followed in cases involving grants from the Mexican Government [8] and from the

---

7. On September 23, 1970, the State filed its Second Amended Original Petition in Intervention. It fixed the date of ouster as March 28, 1942 and further alleged that since that date certain defendants "have drilled 147 oil and/or gas wells on said land and have produced therefrom about 82,218,492 barrels of oil and 105,786,410 Mcf. of gas of a reasonable market value at said time and place of drilling and production to the amount of $262,523,-437." The State did "not limit its dam-

age" to said sum, but sought a strict accounting and judgment for interest on the value "of the oil and gas produced and converted from the date of such conversion at the rate of 6% per annum."

8. State v. Balli, 173 S.W.2d 522, 524 [Tex.Civ.App., San Antonio, 1943; aff'd 144 Tex. 195, 190 S.W.2d 71 (1944)]; Hamilton v. State, 152 S.W. 1117, 1120 (Tex.Civ.App., Austin, 1912, error ref.).

Republic of Texas.[9] While we recognize the rule as being applicable generally, we do not believe that it added to the already onerous burden assumed by appellees when they invoked the summary judgment procedure in this case. Appellees were required to establish as a matter of law that there was so genuine fact issue as to the State's claimed title and the presumption invoked by appellants did not add to that burden. Point one is overruled.

### IV. *Juridical Possession*

Appellees contend that the doctrine of juridical possession operates as a complete defense to the challenge of Atchley and the State against their title.

We have mentioned previously that each of the Portilla grants contained language indicating that the Portillas had been put into possession of the respective grants. This language found in the Felipe Roque Portilla grant is included over the signature of Commissioner Vidaurri, as evidenced by a certified copy of an official translation of the original grant from the General Land Office:

"... I, the undersigned Commissioner, pursuant to the foregoing decree and consent granted by the Empresarios with regard to the admission of Citizen Roque Portilla, adjudicate to him in legal form [the land] ... whom, by the exercise of my authority and in the name of the Supreme Powers of the Mexican Nation and the State, *I put in possession* of said league of land, above mentioned, *which he took quietly and peaceably without any contradiction, and performing all the acts of real and true possession;* ... ."

One of the more authoritative discussions of the doctrine of juridical possession

is to be found in Malarin v. United States, 68 U.S. 282, 17 L.Ed. 594, 595 (1864), wherein Justice Field likened the proceeding to the common law tradition of livery of seisin, spelled out in detail the proceedings had in connection therewith,[10] and concluded that:

"The solemnities attending this official delivery of possession were well calculated to make an impression upon the minds of the spectators, and to preserve the recollection of the act. The ownership, extent and general location of the land were matters thus brought within the knowledge of the neighborhood, and were no doubt afterwards the subjects of frequent reference among the adjoining proprietors."

Responding to appellees' claim under the doctrine of juridical possession, appellants say in their post-submission reply brief:

"The formal act of juridical possession constituted a part of the title procedure in Spanish grants, and in some grants issued by the Mexican government in the State of Tamaulipas, *but the act of juridical possession never constituted a part of the title procedure in grants issued in the State of Coahuila and Texas* under ... which the grants involved in this case and most of the Mexican grants in Texas were issued."

It is true that there are some differences in the wording of the colonization laws of the State of Tamaulipas and those of the State of Coahuila and Texas; but basically they are similar—and neither actually used the term "juridical possession." However, both provide that the grantee shall be put in possession of the lands to which he is

9. State v. Jadwin, 85 S.W. 490, 491 (Tex. Civ.App., Galveston, 1904, error ref.); Producers' Oil Co. v. State, 213 S.W. 349, 353 (Tex.Civ.App., San Antonio, 1919, no writ).

10. E. g.: "[T]he parties went to the center of the land, and there the judge directed the grantee to enter into the possession, which he did, and gave evidence of the fact 'by pulling up grass and making demonstrations as owner of the land.'" (68 U.S. at p. 290)

entitled. Thus, Art. 4, Instruction to the Commissioner, reads:

"He shall issue the land titles in the name of the State, in conformity to the law, *giving the new settlers possession of the same in legal form, and previously citing the adjoining proprietors,* should there be any." Laws and Decrees of Coahuila and Texas, 1 Gammel's Laws, 180, 181 (1898).

Art. 22 of the Colonization Laws of the State of Tamaulipas provided: *"All adjudication and possession of lands designated for settling shall be made with previous citation of the adjoining proprietors."* 1 Gammel's Laws, 454, 457 (1898).

As early as 1854, our Supreme Court considered a title to land in the Power and Hewetson Colony wherein the recitals in the grant bear remarkable similarity to that involved in this case. In White v. Holliday, 11 Tex. 606, 614 (1854), the court said:

"The title introduced in evidence was the final title, vesting the fee, with the possession, in the grantees. It is less formal in its statements and recitals than colonial titles usually are; but it is not, on that account, the less effectual to pass to the grantees the ultimate proprietorship of the soil. It adjudges to the grantees the title and possession of the land, which had been surveyed for them by a Surveyor appointed for that purpose; the Commissioner recites that he puts the grantees in possession, 'performing all the acts of true possession;' and he formally executed to them the title. There remained no act to be done on the part of the government to complete the title. No further act of confirmation or investiture of title was contemplated or required by the law; and nothing further was requisite to vest in the grantees a perfect title."

We agree with appellees when they say, "This is a complete description and application of the effect of juridical possession without the use of the term itself." The grant under consideration by Justice Wheeler in White v. Holliday, *supra,* was not from the State of Tamaulipas but from the State of Coahuila and Texas. See also, Hanrick v. Dodd, 62 Tex. 75, 85 (1884), wherein the court, in dealing with a grant in the Austin and Williams Colony —a part of Coahuila and Texas—mentioned that "[o]n that day, *juridical possession* was delivered to him, . . . and final title extended."

■ We are of the opinion that the doctrine of juridical possession clearly is applicable to grants made by the government of Coahuila and Texas. So holding, we turn to the leading case in Texas: State v. Balli, 144 Tex. 195, 190 S.W.2d 71, 98 (1944), wherein the court said:

\*   \*   \*   \*   \*   \*

"We are of the opinion that doubts, if any, as to the extent and boundaries of a Mexican grant are resolved by the act of juridical possession.

\*   \*   \*   \*   \*   \*

"The act of juridical possession has always been considered a judicial construction or interpretation of an earlier survey."

In *Balli,* the court cited and relied on the case of State v. Russell, 38 Tex.Civ.App. 13, 85 S.W. 288 (Tex.Civ.App., Austin, 1905, writ ref.).

*Russell* was a boundary case involving two Mexican grants. A conflict arose between the grants' calls for adjoinder with the north line of the Santanita survey as their south boundary and their calls for course and distance and acreage. The Court of Civil Appeals resolved this conflict in favor of the calls for adjoinder, in spite of the excess created thereby, relying primarily on juridical possession.

"[I]f there should be any doubt as to which of the calls should prevail, that for course and distance or that for the north line of the Santanita, it should be

resolved in favor of the long-asserted right under the juridical possession which is shown in this case. . . . There is some evidence relating to the act of juridical possession which would justify the conclusion that it extended to the north line of the Santanita; and whatever doubts at this late date could be indulged in with reference to which of the calls should prevail should be resolved in favor of that construction that would include and embrace the land determined by the act of juridical possession." (85 S.W. at p. 294)

In *Balli,* the court quoted this language with approval.

The *Russell Case* relied upon the opinion of the United States Supreme Court in United States v. Pico, 72 U.S. 536, 539, 18 L.Ed. 695 (1867). In that case the court said:

"Were there any doubt of the intention of the governor to cede all the land contained within the boundaries designated by him, it would be removed by the juridical possession delivered to the grantees. This proceeding involved an ascertainment and settlement of the boundaries of the lands granted by the appropriate officers of the government, specially designated for that purpose, and *has all the force and efficacy of a judicial determination.* It bound the former government, and is equally binding upon the officers of our government.

"Such is the purport of the recent decision in the case of Graham v. U. S., 4 Wall. 259 [78 L.Ed. 334] [ante, 334]. . . . *In other words, the case decided that the juridical possession was conclusive as to the boundaries and extent of the land granted.*"

Corrigan v. State, 42 Tex.Civ.App. 171, 94 S.W. 95 (Tex.Civ.App., Austin, 1906, writ ref. 94 S.W. 101), concerned the boundaries of a Mexican grant to Diego Ynojosa. The court noted, at p. 97, "The documentary evidence accompanying the title show[s] that at the proper time the proper steps were taken to establish the juridicial possession" and that the *"land had been in possession of those claiming under the original grant for a number of years, and they were asserting a claim to the extent of the boundaries defined in the [original]* . . . *survey."* The court cited with approval State v. Russell, supra, saying at p. 100:

"In that case we also laid stress upon the fact that, if there was any uncertainty or doubt in the calls, or as to which class of calls should prevail, effect should be given to the extent of the juridical possession, in order to ascertain and determine what land was embraced in the original grant—citing the case of United States v. Pico, 72 U.S. [536] 540, 18 L.Ed. 695."

In reversing the judgment entered in favor of the State of Texas and rendering for the defendant Corrigan, the court concluded at p. 101:

"In fact, as we construe the evidence in the record concerning the calls and the evidence of the location of the surrounding surveys, in connection with the juridical possession, there can be no controversy, in our opinion, as to the fact that the original Diego Ynojosa includes all of the land sued for."

The courts have continued to give effect to the delivery of juridical possession and long continued occupancy under such possession to preclude the existence of a vacancy.

In Strong v. Delhi-Taylor Oil Corporation, 405 S.W.2d 351 (Tex.Civ.App., Corpus Christi, 1966, error ref. n. r. e.), a case bearing many similarities to this one, the vacancy hunter and the State appealed from an adverse summary judgment, contending that a fact issue had been made out on the location of a boundary. The court first noted that the natural objects of the original survey had long since disappeared and that the surveys were then laid out with less than the meticulous nicety

prevalent in modern surveying. However, the court said at p. 369:

"The record is clear, from the positive statements of the surveyors and of the Captain that, juridical possession was given to each grantee."

The legal effect of such juridical possession was clear. The court said at p. 377:

"If there should be any doubt as to which of two possible constructions should prevail—that for course and distance or that of the adjoiner with Los Torritos and other grants, it should be resolved in favor of the long asserted right under juridical possession which is shown in this case. State v. Sais, 47 Tex. 307; State v. Russell, 38 Tex.Civ. App. 13, 85 S.W. 288 (1905) writ ref.; Corrigan v. State, 94 S.W. 95, 100, Tex. Civ.App. (1906) writ ref., at 94 S.W. 101; United States v. Pico, 5 Wall. 536, 72 U.S. 536, 540, 18 L.Ed. 695; Carmichall v. Stanolind Oil and Gas Co. [Tex.Civ.App.], 256 S.W.2d 129, wr. ref."

Indeed, the court concluded, at pages 377 and 378:

"The long continued occupancy (juridical possession) of Porcion 72 with which is conceded to be a valid grant, its adjoinder to the Los Torritos under claim of title and ownership at least since 1876 and probably since 1834, is sufficient to preclude the existence of a vacancy as defined by Art. 5421c [V.A.C.S.]."

In Strong v. Sunray DX Oil Company, 448 S.W.2d 728 (Tex.Civ.App., Corpus Christi, 1969, error ref. n. r. e.), the court said at p. 746:

"A study of the various applications convinces us that the citizens of the col-

ony were placed in juridical possession of the various grants. Many were previous settlers who had built homes and established settlements up and down the river. The tracts were known by the names of the original owners. The Vairin-Fernet Grant recited that 'placing him in possession of that which he represents for himself and his principal of the leagues of land which he has designated, he has taken quiet and peaceful possession, in which act he had made all the necessary demonstrations of true ownership.' If there are are doubts as to the extent of the boundaries of these Mexican grants they are resolved by the act of juridical possession. State v. Balli, 144 Tex. 195, 190 S.W.2d 71 (Tex. Sup.1944). Juridical possession is shown by the evidence of the grants themselves."

The court continued at p. 747:

"Here the lands in question were titled and the grants have not been cancelled or annulled. The long, continued undisturbed and uncontested occupancy of one hundred thirty five years beginning with juridical possession and the adjoinder calls on either side, precludes the existence of any vacancy as defined by Article 5421c, V.A.C.S."

Another important case utilizing the doctrine of juridical possession is that of Harris v. O'Connor, 185 S.W.2d 993, 1014 (Tex.Civ.App., El Paso, 1944, error ref. w. o. m.).[11] There, as here, no maps accompanied the grants and the descriptions "are not as definite and certain as could be desired." The court continued:

"As has been said, the papers introduced do not appear to reflect all the steps in the granting of these lands. If a survey

11. The land involved in this case was claimed under a grant from Coahuila and Texas and was located in the Power and Hewetson Colony. (185 S.W.2d at p. 993). The terms and conditions of the contract of the Empresarios Power and Hewetson are set out in Welder v. Lam-

bert, 91 Tex. 510, 44 S.W. 281, 282 (1898). As was said in Strong v. Sunray DX, supra, "The contract provisions of this colony are so well known that they are a matter of judicial knowledge." (448 S.W.2d at p. 733)

was made, and the grants recite a survey, and you could hardly expect evidence to be on the ground after the lapse of something over one hundred and eight years, the grantee assumed the obligation of erecting the monuments. Unless a survey had been made, this might be a difficult task. In cases of grants it would seem to be the custom of surveyors to make a map of their field notes. No map of the surveyor or surveyors acting under Commissioner Vidaurri appears. But in view of the long lapse of time, attended not only with the ordinary casualties of time, but with war and revolution, it would not be stranger if same had disappeared.

"In our opinion, the delivery of possession has some bearing here on the location of these grants. White v. Holliday, 11 Tex. 606; State v. Russell, 38 Tex.Civ.App. 13, 85 S.W. 288; Corrigan v. State, 42 Tex.Civ.App. 171, 94 S.W. 95; State v. Corrigan, Tex.Sup., 95 S. W. 101; State v. Palacios, Tex.Civ.App., 150 S.W. 229; Graham v. United States, 71 U.S. 259, 4 Wall. 259, 18 L.Ed. 334.

"Without some marking or indication of boundaries, temporary though they might be, a delivery of juridical possession to an area would seem impossible. Many positive acts and forbearances on the part of the State of Texas extended continuously over a long period of years evidences the area involved in the delivery of such possession."

In their post-submission brief, plaintiffs say:

"Assuming . . . that true acts of juridical possession were performed with respect to the grants involved, the question remains, what lands were covered by such acts of juridical possession since the grants do not describe any acts of juridical possession? Where does one go to determine the extent of the hypothetical acts of juridical possession?"

In answering plaintiffs' rhetorical questions, *we go* to Harris v. O'Connor, supra, where we find that Chief Justice Price posed a similar question and then proceeded to answer it in this manner:

"What land did Commissioner Vidaurri deliver to Dr. James Hewetson on or prior to November 19, 1834? The answer is, we think, the land now bounded on the north by the south line of the Swisher Surveys, as marked and established by O'Sullivan. This answer is justified by over one hundred years acquiescence by the Governments of Coahuila and Texas, the Republic of Texas, and the State of Texas; not only by acquiescence, but by numerous other particular acts, particularly by the State of Texas, attesting that the aforesaid line is as before stated. Thus is such line established as a matter of law. Any other holding would impugn the fidelity and integrity of each Attorney General holding office in the State of Texas, and so as to the Land Commissioners." (185 S.W.2d at pp. 1014–1015) [12]

■ What was said in *Harris* applies with equal vigor to the case at bar. The same Commissioner Vidaurri mentioned in *Harris* having placed the Portillas in juridical possession of their grants, acted again seven days later when he placed the Empresarios Power and Hewetson in possession of their adjoining five and one-half league grant.

### V. *Res Judicata, Collateral Estoppel, and Stare Decisis*

■ Although appellees strenuously assert that res judicata and collateral estop-

---

12. If we substitute "Clover, Devenny, and J. Armendaris" for the words "Swisher Surveys," and "Gaffney" for "O'Sullivan," this quotation fits our case precisely. Judge Price was speaking of the junior survey established by surveyor O'Sullivan.

We speak of the junior surveys established by Gaffney. Both were official acts of public officials charged with the legal duties of fixing the boundary lines in the respective cases.

pel constitute valid defenses to the challenge of their title, we disagree. It is true that the location of the easterly boundary of the Portilla grants was the *only* fact issue actually litigated in the conclusive trial of Welder v. Hunt, and we agree that such fact was established by the summary judgment proof.

The very recent case of Benson v. Wanda Petroleum Company, 468 S.W.2d 361 (Tex.Sup.1971), holds that the rule of collateral estoppel bars relitigation in a subsequent action fact issues actually litigated and essential to a prior judgment. (468 S.W.2d at p. 362) However, the rule is that such prior judgment is binding only upon a party and those in privity with him. (Id. at p. 363); Kirby Lumber Corp. v. Southern Lumber Co., 145 Tex. 151, 196 S.W.2d 387 (1946). Further, the rule to be applicable, the judgment must be mutually binding in order to be available as an estoppel in behalf of either of the parties or their privies, *Kirby Case*, supra (196 S.W.2d at p. 389).

Other cases cited in *Kirby* contain similar holdings, e. g., Read v. Allen, 56 Tex. 182, 193 (1882); Horton v. Hamilton, 20 Tex. 606, 611 (1857); Davis v. First Nat. Bank of Waco, 139 Tex. 36, 161 S.W.2d 467, 473, 144 A.L.R. 1 (1942). See also, Masterson v. Harris, 107 Tex. 73, 174 S. W. 570, 575 (1915). We will assume, for the purpose of our discussion of the point under consideration, that the requirement of mutuality is still a part of our law.[13]

In Cockrell v. Work, 122 Tex. 406, 61 S.W.2d 787 (1933), the Supreme Court held that under the acts there under consideration, the private litigant had no power or authority to "bring a suit to establish a vacancy. The state never authorized such a proceeding, and that right never existed in behalf of any applicant to purchase the public lands until the statute of 1919

(article 5323), under which the plaintiff in error filed this suit." (61 S.W.2d at p. 790). The court reasoned that under the earlier statutes, "The state had exclusively conferred" upon the Attorney General the power to institute "appropriate proceedings" to determine the existence of a vacancy. (Id. at p. 791) Finally, the court concluded:

"Until article 5323 was enacted [in 1919], there was no law in existence except that of the Act of April 15, 1905, which authorized any one to bring a suit against adversaries claiming land as patented, except the Attorney General and except where the commissioner of the general land office had sold the land, and, under the provisions of the Act of April 15, 1905, a purchaser was authorized to bring suit." (Id.)

Although the Supreme Court in Welder v. Hunt, supra, discussing the XY line on Map B—the precise line involved in this case—invoked the rule of judicial estoppel, we do not find the doctrine applicable to this case. There the court said:

"And we go further, and say that Welder will be estopped from claiming any of the land east of the line XY, on Map B, by virtue of the proceedings in this case —having set up and notoriously claimed that as his eastern boundary line in this proceeding, nor can he be forced back westwardly by a junior grant." (34 Tex. at p. 47)

It seems clear to us that while Welder might have been estopped from moving his line to the east, this sentence will not estop the State in this proceeding. The State not being a party to that suit is not estopped because, as was said in Davis v. First Nat. Bank, supra (161 S.W.2d at p. 473), "A party who is not bound by a judgment is not permitted to assert that

13. The courts of several states have abolished this requirement e. g., New York in the case of DeWitt, Inc. v. Hall, 19 N.Y.2d 141, 278 N.Y.S.2d 596, 225 N.E.2d 195 (1967), the court saying "that the 'doctrine of mutuality' is a dead letter." See also, annotation in 31 A.L.R. 3d 1044.

another is estopped by it." We interpose the converse of the rule so stated.

In our opinion, the doctrine of res judicata and estoppel by judgment is not available to the appellees in this instance. When we turn to their reliance upon the doctrine of stare decisis, however, we enter an entirely new field.

■ Thirty years ago, Professor Hodges cried out for an authoritative answer to the question posed in his article, "Stare Decisis in Boundary Disputes: Let There Be Light," 21 Tex.Law Rev. 241 (1942). Although Justice Walker said, "No light can be thrown on that problem here," Swilley v. McCain, 374 S.W.2d 871, 875 (Tex.Sup.1964),[14] his discussion of the differences between the doctrine of res judicata and the rule of stare decisis is helpful. Res judicata, extending both to questions of law and issues of fact, binds only the parties to the first suit and those who claim under them; and, it may not be invoked by one who is not bound by the judgment in the earlier proceeding. (Id. at p. 874)

■■ Stare decisis, on the other hand, does not depend upon identity of the parties. A principle, rule, or proposition of law having been squarely decided by the Supreme Court is accepted by all courts "when the very point is again presented in a subsequent suit between different parties." (Id. at p. 875) Justice Walker then continues:

"As a general rule the determination of a disputed issue of fact is not conclusive, under the doctrine of stare decisis, when the same issue later arises in another case between persons who are strangers to the record in the first suit."

In discussing the rule of stare decisis, it was held in Benavides v. Garcia, 290 S.W. 739, 740 (Tex.Comm.App.1927), that "public policy and sound legal administration requires the courts in the decision of cases to observe a proper respect for the prior decisions of the highest court." The court continued (at p. 741):

"It is obvious this rule of decision [stare decisis] is something entirely apart from the conception of res adjudicata or estoppel of any sort. Certain elements enter into the consideration of the binding force of a judgment, or the operation of an estoppel, that have no place whatever in the rule of stare decisis, and the force of the rule is the same whether the parties to the two suits are identical or not, and, as to estoppel, whether they or either of them knew of the prior decision or any of the facts inducing it. Concretely stated, the doctrine merely means that the decisions of law made by the highest court of the state become the law of that state."

This decision was followed by the Supreme Court in Short v. W. T. Carter & Brother, 133 Tex. 202, 126 S.W.2d 953, 964 (1939), and Mitchell v. Mitchell, 157 Tex. 346, 303 S.W.2d 352, 354 (1957). See also, Case-Pomeroy Oil Corporation v. Pure Oil Company, 279 S.W.2d 886, 889 (Tex.Civ.App., Waco, 1955, error ref.); Benson v. Greenville Nat. Exchange Bank, 253 S.W.2d 918, 924 (Tex.Civ.App., Texarkana, 1953, error ref. n. r. e.).

Porter v. State, 15 S.W.2d 191 (Tex. Civ.App., Austin, 1929, no writ),[15] is one

14. Justice Walker was not considering a boundary dispute in *Swilley*, and had he tried to throw light on the subject, such would have been obiter dictum.

15. Although *Porter* has been cited in at least six Supreme Court opinions, the holding has not been disapproved. See State v. Sullivan, 127 Tex. 525, 92 S.W. 2d 228 (1936); Federal Royalty Co. v. State, 128 Tex. 324, 98 S.W.2d 993 (1936); Blake v. Pure Oil Co., 128 Tex. 536, 100 S.W.2d 1009 (1937); Stanolind Oil & Gas Co. v. State, 129 Tex. 547, 101 S.W.2d 801, 104 S.W.2d 1 (1937); Short v. W. T. Carter & Brother, supra; and Swilley v. McCain, supra (374 S.W. 2d 871). This list of citations could be multiplied by listing opinions from the several courts of civil appeals.

of the most persuasive cases on the subject. It was held in *Porter* that prior litigation was controlling under the rule of stare decisis. There had been a lawsuit, Wilson v. Giraud, 234 S.W. 110 (Tex.Civ. App., Galveston, 1917, no writ), involving a boundary suit. Only Wilson and Giraud were parties to this suit. The Supreme Court, answering certified questions, determined the location of the disputed line. Wilson v. Giraud, 111 Tex. 253, 231 S.W. 1074 (1921). The State recovered certain lands as vacant public lands in its litigation with Porter, after introducing the pleadings and judgment in the prior Wilson v. Giraud suit. The court in *Porter,* recognizing that the general rule prohibits the introduction of the judgment record in another suit, said:

> "Though different parties and different lands were involved in that case [Wilson v. Giraud], the same original surveys, boundary lines, and acts of the same surveyors, which determine the result of this suit, were involved. And the court's determination of those matters, 'even though it is presented by different parties and concerns different properties,' becomes binding and conclusive in subsequent litigation involving them, not as res adjudicata, but under the doctrine of stare decisis. Benavides v. Garcia (Tex.Civ.App.) 283 S.W. 611." (15 S.W.2d at p. 194)

In Blaffer v. State, supra (31 S.W.2d 172, 190), there were two suits involving alleged vacancies in that case. The earlier litigation was had in 1906 and resulted in judgments denying the existence of a vacancy. The State was not a party to either of these suits. Long after the trial court judgments had become final, it was learned that the plaintiffs in the two suits had procured their patents under fraudulent circumstances and the State claimed in the *Blaffer* litigation that the "Tomey and Goldman locations were absolutely void ab initio." (31 S.W.2d at 186) Upon appeal in *Blaffer* it was said at p. 190:

> "The state contends that the judgments in the Tomey and Goldman suits are not binding upon the state, and are therefore as to the state not competent evidence in locating the boundaries involved. We do not agree with this holding. The general rule of law relied upon is that a judgment is binding only as to those party or privy to it. In the establishment of ancient boundaries, however, a relaxation of the strict rules of evidence, ordinarily applied in establishing other facts, is frequently met with. See Texas Jurisprudence, vol. 7, pp. 209, et seq.

> "In Porter v. State, 15 S.W.2d 191 (error refused) this court held (Justice Baugh writing) that, 'though the parties to and lands involved in two actions are different, yet the same original surveys, boundary lines, and acts of the same surveyors, which determine the second action, having been involved in the other prior action, the determination of those matters by the highest court of the state in the prior action are binding and conclusive in the subsequent action, not as res judicata, but under the doctrine of stare decisis.' (Quotation is from the syllabus.) The record here shows that in the two contested cases, which were tried more than 20 years before the trial of this case and involved the same boundaries here in issue, a number of witnesses, now deceased, had testified, and much evidence had been obliterated, due to intensive oil development, fires, etc. While the above announced rule of stare decisis only applies to the decisions of the Supreme Court, we think the judgments of the trial courts, under the circumstances shown, were admissible as circumstances along with other shown recognition."

The judgments under discussion in *Blaffer* were less than a quarter of a century old; in our case, the judgments are dated more than one hundred years ago. When we come to consider some of the "circumstances" as done in *Blaffer*, we note that

the official map of San Patricio in the General Land Office, dated November 24, 1896, locates the easterly line of the Portilla grant on the north-south line between the Aransas and Chiltipin Creek, with this notation: "Tit. Oct. 23, '34. B.17.P.32" Shown immediately to the east of the easterly line of the Portilla grant there appear the J. Armendaris, the N. J. Devenny and the Isaac Clover surveys, all junior to the Portilla grant and located upon the westerly portion of the void Power and Hewetson five and one-half league grant. A later map of the General Land Office dated August 30, 1939, is identical to the first insofar as this particular area is concerned.

The doctrine of stare decisis was utilized by the court in a boundary case, Federal Royalty Co. v. State, 128 Tex. 324, 98 S. W.2d 993, 996 (1936), (known as the Whiteside Case), where the court cited Porter v. State, supra (15 S.W.2d 191); Blaffer v. State, supra (31 S.W.2d 172); McDonald v. Humble Oil & Refining Co., 78 S.W.2d 1068 (Tex.Civ.App., Beaumont, 1935, error dism.); and 26 Tex.Jur., § 368, pp. 46, et seq.; id. § 493, pp. 303, et seq. [now to be found in 34 Tex.Jur.2d, Judgments, § 452, pp. 495, et seq. (1962)]. Justice Walker noted that the late Justice Norvell in Horne v. Moody, 146 S.W.2d 505 (Tex.Civ.App., San Antonio, 1940, error dism., judgm. cor.), "refused to disregard orthodox limitations on the doctrine of stare decisis even in boundary cases." Swilley v. McCain, supra (374 S.W.2d at p. 875). Justice Walker also noted another case—Dunn v. Land, 193 S.W. 698 (Tex. Civ.App., San Antonio, 1917, no writ)—as refusing "to disregard orthodox limitations."

Thus, the two conflicting lines of cases which could not be reconciled or harmonized in *Swilley,* continue with unimpaired vitality. Being forced to choose between the two lines, we choose what might be termed, in Justice Walker's language, the "unorthodox" view, and follow *Federal Royalty,* supra, and cases therein cited.

We conclude, from our examination of the record and the authorities, only some of which are set out above, that the XY line on Map B, as mentioned in Welder v. Hunt, supra (34 Tex. at p. 47), is "binding and conclusive in [this] subsequent litigation." Benavides v. Garcia, supra (290 S.W. at p. 740); Porter v. State, supra (15 S.W.2d at p. 194); Blaffer v. State, supra (31 S.W.2d at p. 190); Eppenauer v. Ohio Oil Co. (5th Cir. 1938), 98 F.2d 524, 525.

## VI. *Presumption*

In United States v. Devereux (4th Cir. 1898), 90 F. 182, 187, the court was considering a claim by the United States to certain land which it claimed under an instrument executed in 1816. The defendants had gone into possession of the land in 1829 and had been in possession "for over 60 years."

The court, in disposing of this belated claim of the sovereign, said:

"After this great lapse of time, courts will presume anything and everything to have been done which, if done, would be a bar to the claim. Id. 869 [2 Lewin, Trusts, 868]; Roe v. Ireland, 11 East, 280. This rule of presumption is one of policy as well as of convenience, and necessary for the peace and security of society. 'If time,' said Lord Plunkett, 'destroys the evidence of title, the law has wisely and humanely made length of possession a substitute for that which has been destroyed. He comes with a scythe in one hand to mow down the muniments of our rights, but in his other hand the lawgiver has placed an hourglass, by which he metes out incessantly those portions of duration which render needless the evidence he has swept away. Whart Ev. § 1338, note 5.'

\*     \*     \*     \*     \*     \*

"Presumption does not operate like the statute of limitations, and bar a right which is known to exist; or like laches,

which deprives one of a right which did exist. It operates as evidence, and establishes the conclusion that the right which did exist has been duly relinquished by the possessor of it.

"Wharton, in his Law of Evidence (section 1348, note 1), puts it in this way:

" 'Thus, the lapse of time does not of itself furnish a conclusive legal bar to the title of the sovereign, agreeably to the maxim, "Nullum tempus," etc., yet, if the adverse claim could have had a legal commencement, juries are instructed or advised to presume such commencement after many years of uninterrupted adverse possession or enjoyment.'

"Laches and the statute of limitations affect the remedy. Presumption clothes with a right. The statute of limitations ripens a trespass into a legal title because of neglect of the true owner. Presumption concludes that a lawful origin existed."

The attack upon the precise location of the XY line—the easterly line of the Portilla grant—was made for the first time and, in this case, more than a hundred and thirty years after the act of juridical possession had been celebrated. Judge Wheeler in Baker v. Coe, 20 Tex. 430, 437 (1857), was speaking of the presumed regularity of probate proceedings when he said:

"Presumptions must be indulged in favor of those proceedings, especially when they are ancient, and titles have been acquired and transmitted under them, or it would indeed be true that time, instead of healing, as it should, the defects of these titles, would gradually undermine, and eventually destroy them."

And, we adopt Chief Justice Green's remarks made in Page v. Pan American Petroleum Corporation, 381 S.W.2d 949, 954 (Tex.Civ.App., Corpus Christi, 1964, error ref. n. r. e.) : "If the necessity for a legal presumption existed back in Judge Wheeler's time, it is many fold more essential today."

Ordinarily, such a presumption is one of fact, but, as was said in Clements v. Texas Co., 273 S.W. 993, 998 (Tex.Civ.App., Galveston, 1925, error ref.) :

"[S]uch a presumption, having to do with a transaction 80 years in the past, becomes, for all practical purposes, one of law, for generally the great age which raises the presumption also obliterates the evidence which might have overthrown it. It becomes immaterial, in short, whether it be considered a rebuttal or conclusive presumption."

In this expropriation action, we recount only a small portion of the family history of *Felipe Roque Portilla*—whose easterly boundary is in issue here—in order to show the long connection of the defendants with the land in question. Felipe Roque Portilla had six sons and two daughters. Insofar as material to this point, we mention only one, Dolores, who married the Empresario James (Santiago) Power in 1832. There was born to this union a daughter, also named Dolores, who married the original John Welder in 1850.[16] Many descendants of the original John Welder are defendants in this action, there even being one named John J. Welder (Defendant No. 103) who is sued as Executor and Trustee of the Estate of R. H. Welder, deceased. The defendants all claim and exhibited record title under the original John Welder.

Insofar as our record shows, once John Welder, then owning the Felipe Roque Portilla grant, had obtained his patents to the Clover, Devenny, and J. Armendaris surveys to the east thereof in the middle 1870's, no one challenged his title until

16. Some of the early genealogy of the Welder family is to be found in Welder v. Lambert, supra (44 S.W. at 282–283).

Atchley came on the scene nearly a hundred years later. In the meanwhile, there was an entirely new ball game in existence. From an unsettled wilderness the area had been developed into an extremely valuable oil field as well as being profitably used for other purposes by the original John Welder's descendants.

Undoubtedly, the State of Texas has collected large sums of money from the oil and gas produced from the lands in controversy under the provisions of Title 122A, Chapters 3 et seq., V.A.C.S., as well as ad valorem taxes before and after the discovery of oil.[17]

We are thoroughly familiar with the rule that doctrines of waiver, estoppel, and limitations are not applicable in suits in which the State is a party. But, we are also familiar with the rule "that the law presumes that a public official has rightly performed his duty." Anderson v. Polk, 117 Tex. 73, 297 S.W. 219, 222 (1927).

In the important case of Harris v. O'Connor, supra (185 S.W.2d 993, 1010), commenting upon the legislative enactments making it the duty of the Attorney General to institute suits on behalf of the State to recover the public lands (a portion of which now appears as Art. 5420, V.A. C.S.), the court spoke of the illustrious men who had served in the office of Attorney General of Texas, naming some twenty-one in number.[18] The court continued:

"Some of these gentlemen, after their services as Attorney General ceased, were honored by the people of the State by election to the highest executive and judicial positions within the gift of the people. Before the Act of 1901, above quoted, we think it was in the purview of the duties of the Attorney General to recover for the State land illegally withheld. The Act quoted made it their specific duty to institute legal proceedings on behalf of the State under the conditions named in the law quoted. Are we to assume that these honored, distinguished and able gentlemen neglected their duty? or are we to apply the presumptions that they discharged their official duty with fidelity and diligence? The answer is, we think, that they are presumed to have discharged their official duty with fidelity and diligence."

To the twenty-one so named by Judge Price, we add the names of Gerald C. Mann, Grover Sellers, Price Daniel, John Ben Shepperd, Will Wilson, and Waggoner Carr, and note that we consider them likewise to be "honored, distinguished and able gentlemen" who "are presumed to have discharged their official duty with fidelity and diligence."

The Portilla grants were governed by the law of the State of Coahuila and Texas, and the validity thereof must be determined by such laws. Thus, as stated in Harris v. O'Connor, supra (185 S.W.2d at p. 1015):

"These grants were not to citizens either of the Republic of Texas or the State of Texas, for neither of these governments was in existence on the date of the grants. A proprietary title to any part of the territory in controversy was never vested in the State of Texas.

17. Cf. Superior Oil Co. v. Sinton Independent School Dist., 431 S.W.2d 383, 389 (Tex.Civ.App., Corpus Christi, 1968, no writ), wherein the oil company *tendered* in excess of two hundred thousand dollars into the registry of the court in payment of what it contended were the legal ad valorem taxes due upon its properties for a single year. In all probability, the dispute was over taxes upon the land involved in this suit.

18. Chief Justice Price in Harris v. O'Connor, supra, said: "We shall not enumerate them all, but mention only a few: James Wille, William Steadman, W. M. Walton, George Clark, John D. Templeton, James S. Hogg, Charles A. Culberson, M. M. Crane, T. S. Smith, Charles K. Bell, R. V. Davidson, Jewell P. Lightfoot, James D. Walthall, B. L. Looney, C. M. Cureton, W. A. Keeling, Dan Moody, Claude Pollard, Robert Lee Bobbitt, James V. Allred, William McGraw."

\*   \*   \*   \*   \*   \*

"Even though a boundary may not be fixed between the State and a grantee claiming under a Mexican grant by a long acquiescence, operating as a contract or by the way of estoppel, absent better evidence it may be considered in establishing the actual boundary."

▮ The presumption which we apply here does not depend on the lapse of time alone. The fact here presumed is that the grants from the State of Coahuila and Texas included the area claimed by the defendants. The basis of such presumption is, as we have indicated earlier, the course of conduct on the part of the duly authorized officers of the State of Texas inconsistent with any other reasonable conclusion. Harris v. O'Connor, supra.

We adopt this language from Barrow v. Boyles, 122 Tex. 416, 61 S.W.2d 783, 787 (1933): "Should we accept plaintiff in error's views, we should adjudge that the officials of no less than three governments, including our own Texas commissioners of the general land office and Attorneys General, have been derelict in duty during the periods of some three generations. Not a fact is averred at all sufficing to negative the presumption of the rightful exercise of official power as it is disclosed by plaintiff in error's own petition." Excepting the fact that we have more than three generaions involved, the quotation is applicable here.

Our conclusion in this regard is strengthened when we recall that more than a hundred years ago our Supreme Court in Welder v. Hunt commented upon the very contention now urged upon us by the appellants, that is to say, "that there was no eastern boundary line fixed to the Portilla grant, and it was not governed by courses and distances." (34 Tex. at p. 47) This was an open caveat to the then occupant of the office of Attorney General (William Alexander) and to every one of his successors during the following century.[19]

We must remember, too, that presumptively the Commissioner of the General Land Office knew of this pronouncement by our Supreme Court. Yet, within a few years thereafter, he patented the junior surveys (the Clover, Devenny, and J. Armendaris) each of which called for joinder to the easterly line of the Portilla grant, as found on the ground by the official surveyor.

We do not extend the doctrine of presumption in this case. It is present and the facts compel its recognition and application to the undisputed facts we review in this record.

## VII. *Abandonment*

This theory of the plaintiffs is advanced under their eighth point which we reproduce in the footnote.[20] By a laborious process of sifting through the mass of pleadings and "summary judgment proof"[21] we learn that one of the principal bases of the contention so advanced is that Dolores Portilla Power, the daughter of Felipe de la Portilla and mother of the first John Welder's wife, wrote a letter in July of 1836 to her husband wherein she said:

"Ever since the . . . Indians killed my brother at the ranch, . . .

19. Athough this opinion was by the Semi Colon Court, it has been cited by our Supreme Court at least three times. See in this connection, Norvell, "Oran M. Roberts and the Semi Colon Court," 37 Tex. Law Rev. 279 (1959).

20. "The trial court erred in granting appellees' motions for summary judgment and in thereby depriving appellants of a jury trial as to the ground of recovery asserted in Section IX of Appellant Atchley's trial pleadings."

21. We are advised by a footnote, "These documents, and translations thereof, are attached to the State's Motion for Summary Judgment, and the First, Second and Third Supplements thereto, and are concisely summarized in such pleadings. (5.1, 5.2, 5.3, and 5.4)"

my father decided to abandon everything and c(om)e with the whole family to this [town] of Matamoros where we arrived on the eighth day of last June with much difficulty."

Plaintiffs contend that the Mexican law in effect in 1836 upon which they rely is Law 50, Title 28, Third Part, Las Siete Partidas, ["Las Siete Partidas," Translation and Notes of Samuel Parsons Scott, 1931, published for the Comparative Law Bureau of the American Bar Association by Commerce Clearing House, Inc., at page 837] which we reproduce from their brief:

> " 'When a man abandons any immoveable property which belongs to him, for the reason that he does not like it, as soon as he actually leaves it with the intention of not claiming it afterwards as his, whoever first enters upon it will become its owner. But where he does not leave it, although he may state that he does not desire it to be considered his from that time forth, nevertheless while he still holds it in this way no one else has the right to enter upon it; and if he does, he will not obtain its ownership until the party actually leaves it, and abandons its possession.' "

Their principal case is Sydeck v. Duran, 67 Tex. 256, 3 S.W. 264 (1887), and its progeny.

Defendants, relying upon the first sentence in the quotation above, aptly reply that even upon abandonment title to the land does not revert to the sovereign but passes from the landowner to the first entrant, and conclude: "Thus, even if the Portillas abandoned the land, under the clear language of the statute, the land became the property of John Welder, 'who first enter[ed] thereon.' " We agree.

In one of the briefs filed in the trial court and now assimilated into appellants' brief here by reference, we find that plaintiffs below recognized that their contention now made is contrary to the holding of Chief Justice Wheeler in Kilpatrick v. Sis-

neros, 23 Tex. 113, 125, et seq. (1859). They argued below that Judge Wheeler's interpretation of Article 30 of the Coloniation Law of 1825 "is obviously erroneous." (Appendix to Appellants' Brief, Tab. 4, p. 15.)

The cases cited by plaintiffs do not support their contention that the land, in effect, escheated to the sovereign when the country was abandoned. The cited provision of the colonization law plainly provides that title passes from the landowner to the first entrant. In *Kilpatrick* the court reviewed the earlier cases and said:

> "These references will suffice to show, that it has been settled by repeated decisions of this court, that removing from the republic of Texas into Mexico, did not, ipso facto, vacate the title of the owner to his lands, acquired under the colonization laws." (23 Tex. at 130)

Harris v. O'Connor, supra, which we have cited many times herein, had this to say about plaintiffs' contentions:

> "This provision of the Partidas does not seem to provide that the title to land upon abandonment shall vest in the State. It seems to be in accordance with the common law as to the abandonment of corporeal personal property." (185 S.W.2d at p. 1012)

We have carefully considered the *Sydeck Case* and do not agree with plaintiffs' analysis thereof. Judge Gaines in *Sydeck* quoted the section of the Partidas, and noted that abandoned lands " 'become the property of him who first enters thereon.' " (3 S.W. at p. 267) Furthermore, there is no such similarity of facts in *Sydeck* and *Kilpatrick* as to bring about a conflict in the two cases.

Musquis v. Blake, 24 Tex. 461, 466 (1859) found the court re-examining its then recent decision in *Kilpatrick*, saying:

> "A re-examination of the subject here, is therefore unnecessary. The revolution did not divest or impair the plaintiff's

right of property in the land, which had been granted to him; nor did his removal to Mexico incapacitate him to maintain this action for its recovery."

Although plaintiffs place reliance upon this court's opinion in Foster v. Gulf Oil Corporation, 335 S.W.2d 845, 849 (Tex. Civ.App., Beaumont, 1960, error ref. n. r. e.), we feel that the reliance is misplaced. There, Chief Justice Anderson made several assumptions, including "that he did abandon the land and even the country," before coming to the crux of his holding: "[T]he status of the land has not under either theory been altered from that of surveyed and titled land, there having been no assertion of the escheat or forfeiture nor any regrant of the land prior to—nor since—the time at which the State of Texas came into being and its Constitution of 1845 was adopted." That is precisely the situation which we face here.

Insofar as our record discloses, John Welder was the first one who entered upon the land after it had been abandoned, if it was, by the Portillas. Plaintiffs may not prevail upon their theory of abandonment. For, as was said in Hanrick v. Dodd, supra (62 Tex. at 89):

"Under Mexican law, as under the common law, an estate granted by the government cannot afterwards be divested upon mere surmise or suggestion. A formal conveyance, or a regular proceeding, is requisite."

There has never been either a formal conveyance or a regular proceeding divesting the Portilla title to the land involved herein.

## VIII. *Conclusion*

We have purposely refrained from commenting upon plaintiffs' points contending that the testimony of their surveyor Simpson raised fact issues for determination. In our opinion, for the reasons heretofore stated, as a matter of law, there is no vacancy existing and such testimony of Simpson was immaterial to any issue before the trial court. So holding, all of such points are overruled.

However, out of an abundance of precaution, and in the event the Supreme Court should disagree with us as to the basis of our affirmation of the judgment, then and in such event we hold that Simpson's testimony, if material to any issue in the case, raised fact issues for determination in a full adversary trial. Under the rationale of *Gibbs*, supra (450 S.W.2d 827), the trial court committed error in granting defendants' motions for summary judgment. However, as stated above, we do not reach the question of surveying by Simpson.

We have likewise refrained from commenting upon many of the subsidiary points brought forward by the plaintiffs. The nature of the scheme of briefing followed by plaintiffs has made our task unusually difficult, but each of the points has been considered and found to be without merit.

It follows from what has been said that we are of the opinion that the defendants have discharged their onerous burden and the judgment of the trial court in granting the summary judgment was correct.

Judge Thornberry in Humphries v. Texas Gulf Sulphur Company (5th Cir. 1968), 393 F.2d 69, 74, effectively expressed our conclusion applicable to this case when he said:

"It is simply not rational to assume that more than 125 years would have passed without a claim being made to the land if there were any substance to the claims. Such a policy is anchored on a practical and correct view of human nature, as reflected by the Texas cases, that men seldom have rights of value which are unknown to them, and more seldom still will men suffer themselves to be deprived of the enjoyment of these rights for any length of time. It also prevents time, which should heal the

scars on title, from gradually undermining the title to land."

The judgment of the trial court is in all things affirmed.

APPENDIX

Map B mentioned in the Supreme Court opinion of Welder v. Hunt, 34 Tex. at p. 47

1. Alexander Dunlap
2. Amasa Turner (Two tracts)
3. Wiley Jones
4. Johnston Roselle
5. J. Kelly (Two tracts)
6. XY line mentioned in Welder v. Hunt

M A P  C

Prepared by Surveyor Byron
L. Simpson in July and August,
1965, showing claimed vacancy.

M. A. 58291

12,066.37 ACRES

Claimed Vacancy